Harold **MARSHALL** and Betty Marshall, Individually and d/b/a HOM Investments, Appellants,

v.

**RYDER SYSTEM, INC.,** Convoy Company, Complete Auto Transit, Inc., Woodward–Clyde Consultants, Alan F. Fish, Daniel J. McClellan and Enecotech, Inc., Appellees.

No. 14–94–00872–CV.

Court of Appeals of Texas, Houston (14th Dist.).

July 3, 1996.

Rehearing Overruled Aug. 15, 1996.

---

Douglas K. Womack, Leta J. Womack, Houston, for appellants.

Russell W. Miller, Houston, Jennifer K. Lipinski, Jane Weber, Austin, Eva Fromm, David Wilks Corban, Theodore Baroody, William J. Boyce, Houston, for appellees.

Before LEE, HUDSON and EDELMAN.

## OPINION

HUDSON, Justice.

Appellants, Harold and Betty Marshall, Individually and doing business as HOM Investments, sued appellees Ryder System, Inc. ("Ryder"), Complete Auto Transit, Inc. ("CAT"), and Convoy Company ("Convoy") for the alleged contamination of their proper-

ty with spilled diesel fuel. The appellants also sued appellees Woodward–Clyde Consultants ("Woodward"), Enecotech, Inc., Alan F. Fish, and Daniel J. McClellan for allegedly failing to clean up the spill site. The court dismissed all of appellants' claims when it imposed a "death penalty" sanction for appellants' refusal to answer questions regarding the surreptitious "spiking" of monitoring wells with diesel fuel. The Marshalls appeal the order of dismissal. We affirm.

Appellants bring six points of error, claiming that: (1) the trial court erred in failing to consider lesser measures before imposing a "death penalty" sanction; (2) the dismissal was arbitrary and excessive; (3) the dismissal denied appellants the right of due process; (4) the trial court abused its discretion in finding that an abatement of the civil action during the pendency of criminal proceedings would not adequately deter appellants' disobedience nor adequately punish appellants for their failure to comply with the court's order to compel discovery; (5) any prejudice suffered by appellees stemming from appellants' refusal to comply with discovery requests is outweighed by appellants' Fifth Amendment privilege; and (6) the privileged information sought by appellees would not have altered, controlled, or determined the outcome of the case.

### Facts

In 1981, Convoy leased property from the Marshalls for use as a truck terminal and installed an underground petroleum storage tank on the premises. In January 1987, Ryder and CAT purchased Convoy, who continued to operate the facility until they surrendered the premises in March 1988.

Based on an inventory shortage of approximately 175 gallons of diesel fuel, Convoy reported a suspected leak from its underground tank to the Texas Water Commission in September 1987. Convoy then retained Woodward to restore the site and oversee the removal of the storage tank and any fuel that may have leaked into the soil. In March 1989, Woodward installed a groundwater recovery system that included two recovery wells to pump spilled diesel fuel from the soil and a number of monitoring wells to provide water samples for testing.

The system, however, was plagued with unexplained, unusual, and intermittent problems. Electrical wires were found cut or nicked, and dials on the control panel were misadjusted. Woodward's employees would correct the problems, only to have them reappear the following day. Employees also reported finding substantial amounts of pure diesel fuel in monitoring wells that contained little or no fuel the day before. Suspicious of tampering, employees of the environmental consultant asked Harold Marshall if they could remain on the property overnight to investigate the unexplained anomalies. Marshall denied their request. The irregularities persisted for months, culminating with the disappearance of both pumps from the recovery wells. The Marshalls filed their lawsuit in October 1992, ostensibly because the cleanup effort was seemingly ineffective.

On May 13, 1993, Jeffrey Blanken, an environmental geologist, decided to watch the Marshalls' property in hopes of finding an explanation for the enigmatic data generated by the monitoring wells. After making their routine check of the monitoring wells, Blanken and a co-worker withdrew to a vantage point on the southwest side of the property. Half an hour later, Harold Marshall appeared at the site. Blanken watched Marshall open several well caps and retrieve a white container from the trunk of his car. Returning to the first well with the container, Marshall briefly crouched over the well head and then resealed it. Marshall repeated this process at each well, returning to the trunk of his car before moving on to the next well.

When Blanken and his co-worker returned to the property on the morning of May 20, 1993, they found Marshall already present at the site. The men spoke with Marshall, monitored the wells, and left the area. Immediately returning to their former vantage point, they again observed Marshall crouched over a monitoring well.

Alerted to Marshall's suspicious activities, Ryder arranged for a private investigator and an investigator from the City of Houston Pollution Control Department to watch the property. On the morning of June 3, 1993, the investigators took up a position in a shed on property next to the spill site. Marshall appeared within an hour of their arrival. Marshall waited by his car until the test team from the environmental consultant arrived, and he spoke briefly with the team before they performed their routine monitoring. After the team had departed with its water samples, Marshall waited several minutes before he went to the trunk of his car and retrieved several yellow plastic containers. Marshall poured a dark fluid out of the large yellow jugs into smaller vessels resembling sixteen-ounce soft drink bottles. He then carried the soda bottles to eight of the monitoring wells, opened them, and poured approximately one bottle of fluid down each well.

After resealing the wells, Marshall put some fluid into two "pickle-type" jars and dropped them over the fence onto adjacent property where there were additional monitoring wells. Police confronted Marshall as he was going onto the adjacent property. Law enforcement officers took samples from the wells and from the containers found in the trunk of Marshall's car. Tests revealed the dark fluid found inside the containers was diesel fuel, and that this fuel matched the contaminants extracted from the monitoring wells. Criminal charges were filed against Marshall for water pollution and tampering with evidence.[1]

Appellees filed a motion to dismiss claiming the Marshalls had based their suit, at least partly, upon fabricated evidence. The court denied their motion. Appellees then served the Marshalls with discovery requests. Claiming a Fifth Amendment privilege against self-incrimination, the Marshalls refused to answer questions related to the

spiking of the wells. The trial court granted appellees' motion to compel and ordered the Marshalls to appear and resume their oral depositions. The court further ordered appellants to fully answer the questions about Marshall pouring substances into the monitoring wells. The Marshalls resisted, without success, seeking writs of mandamus in this Court and the Texas Supreme Court. When they did not prevail on their requests for extraordinary relief, the Marshalls sought unsuccessfully to quash the notices of deposition issued pursuant to the trial court's order compelling discovery. In a final act of defiance, the Marshalls did not appear for their properly ordered depositions.

Appellees filed another motion to dismiss. On May 4, 1994, twelve days before trial, the court granted appellees' motion to dismiss. The trial court based its dismissal order on several factors: (1) the Marshalls exhibited bad faith in tampering with evidence during pendency of the lawsuit; (2) their refusal to comply with the court's discovery order; and finally, (3) the court found that an abatement of the proceedings would not be adequate to secure appellants' compliance with its order, nor would it punish them for their failure to comply with its discovery orders.

### Standard of Review

 The trial court has discretion to impose discovery sanctions, and any sanction imposed will be set aside only when it is shown that the trial court clearly abused its discretion. *Bodnow Corp. v. City of Hondo,* 721 S.W.2d 839, 840 (Tex.1986). The court may consider everything that has occurred during the history of the litigation, and its contemplation of sanctions is not limited to the specific violation for which sanctions are ultimately imposed. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241 (Tex. 1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). The test for abuse of discretion is whether the court acted without reference to any guiding rules and principles, *i.e.,* whether the trial court acted arbitrarily or unreasonably. *Id.* at 242.

1. At oral argument, appellant's counsel advised the Court that the criminal cases were dismissed

when the State concluded that Marshall was incompetent to stand trial.

While a trial court may impose a "death penalty" sanction when civil plaintiffs refuse to comply with discovery by exercising their Fifth Amendment privilege against self incrimination, that sanction must not be excessive. *See Texas Dep't of Pub. Safety Officers Ass'n v. Denton,* 897 S.W.2d 757, 759–60 (Tex.1995); Tex.R. Civ. P. 215(1)(b). The sanctions must bear a direct relationship between the offensive conduct and the sanction imposed. *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex. 1991) (orig.proceeding).

### Sanctionable Conduct

It is well established that the Fifth Amendment privilege may be asserted in civil cases where a party reasonably believes its answers will be incriminating. *McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924); *Denton,* 897 S.W.2d at 760 (citing *Wehling v. Columbia Broadcasting Sys.,* 608 F.2d 1084, 1086 (5th Cir.1979)). Ordinarily, a court should not penalize a party's assertion of the privilege. *Spevack v. Klein,* 385 U.S. 511, 515, 87 S.Ct. 625, 628, 17 L.Ed.2d 574 (1967). However, a party must not assert the privilege in a way that renders the civil proceeding unfair. *Denton,* 897 S.W.2d at 760.

The Marshalls contend that they have narrowly tailored the exercise of their privilege and that it covers only specific acts occurring in May and June 1993. The record, however, reflects a much broader and sometimes inconsistent claim of privilege. At Mrs. Marshall's deposition, for example, she claimed a spousal privilege for her husband's activities in 1993, 1992, 1991, and 1990. This assertion of the privilege is without merit. The marital privilege is limited to *confidential* communications between spouses. Tex.R. Civ. Evid. 504(b). Only in criminal cases is there a broad, general privilege *protecting a person from being a witness against his or her spouse.* Tex.R.Crim. Evid. 504(2).

In his responses to Ryder's requests for admissions, Mr. Marshall initially asserted his Fifth Amendment privilege for acts specifically observed by law enforcement officials on June 3, 1993. Mr. Marshall later admitted "spiking" the monitoring wells on June 3, 1993. Despite this admission, Marshall's attorney thereafter advised opposing counsel that his client would not respond to any questions regarding criminal activity at the well sites.

Appellees contend the Marshalls wielded their Fifth Amendment privilege offensively to withhold relevant information vital to the defense. We agree. In developing his case, a defendant has the right to develop affirmative defenses that could terminate plaintiff's cause of action. When a claimant seeks to withhold pertinent information from a defendant by asserting his privilege against self-incrimination, he transforms his Fifth Amendment shield into a sword. *Denton,* 897 S.W.2d at 760–61. Three factors must be considered before we may determine whether a party has made an offensive use of his privilege: (1) whether the party asserting the privilege is seeking affirmative relief; (2) whether the party is using the privilege to protect outcome determinative information; and (3) whether the protected information is not otherwise available to the defendant. *Id.*; *Republic Ins. v. Davis,* 856 S.W.2d 158, 161 (Tex.1993).

### (1) Affirmative Relief

Because the Marshalls' petition asked for an award of several million dollars in actual and punitive damages, they have sought affirmative relief.

### (2) Outcome Determinative Information

The gravamen of the Marshalls' suit rests upon the ineffectiveness of appellees' cleanup efforts and the continued presence of diesel fuel in the monitoring wells. An underground leak cannot be easily measured or observed, and the only means by which liability or damages can be assessed is by chemical analysis of water samples taken from the wells. In a premeditated effort to enhance his ongoing suit, Mr. Marshall tampered with key evidence by pouring diesel fuel down these wells and intentionally polluting the area. The spiking of the wells does not merely affect damages, it exacerbates and perpetuates the injury upon which liability is

predicated. Marshall's manipulation of the evidence by polluting the monitoring wells has effectively eclipsed any evidence of the initial spill and halted the effectiveness of appellees' cleanup efforts.[2] The duration, frequency and extent of Marshall's tampering has a direct impact on the central issue of the case. To allow the Marshalls to wield their Fifth Amendment privilege offensively would deny appellees information crucial to their defense. We overrule appellant's sixth point of error.

### (3) Alternative Sources of Information

We must next determine whether the information sought by appellees could be obtained without requiring the plaintiff to waive his privilege. *Denton*, 897 S.W.2d at 762. The record suggests Marshall acted alone when he tampered with the wells. No one, other than perhaps Mrs. Marshall, knew of his activities, and she has also claimed a privilege. Because of the covert nature of the spiking, information regarding the full scope and duration of Marshall's tampering would have to be obtained from appellants. Because disclosure of the privileged information is the only complete means by which appellees may obtain the needed evidence, the third prong of the test is satisfied. *Republic*, 856 S.W.2d at 163.

After a review of the evidence, we conclude that appellants' actions constitute an offensive use of the Fifth Amendment privilege. *Republic*, 856 S.W.2d at 161.

### The Remedy

Once a party has made an offensive use of their privilege, that party may be forced to elect between maintaining the privilege and risking the imposition of sanctions. *Denton*, 897 S.W.2d at 763. When the Marshalls elected to maintain their privilege, they exposed themselves to remedial action by the court. *Id.* Discovery sanctions are measured by two overarching standards: (1) a direct relationship must exist between the offensive conduct and the sanction imposed,

and (2) the sanction must not be excessive. *Hamill v. Level*, 917 S.W.2d 15, 16 (Tex. 1996).

When a party's cause of action is dismissed because he invokes the privilege against self-incrimination, certain due process concerns arise. *Denton*, 897 S.W.2d at 763. To decide what options are available and appropriate, we must weigh several factors. *Id.* First, the nature of the questions asked and the privilege asserted must be considered. *Id.* Questions that ask for facially incriminating answers normally cut against the imposition of a harsh remedy. *Id., Campbell v. Gerrans*, 592 F.2d 1054, 1057 (9th Cir.1979). However, the court can look at these questions and determine whether a more narrow inquiry could serve the defendant's discovery needs and allow the plaintiff to avoid the self-incrimination problem. *Denton*, 897 S.W.2d at 763.

Second, the court should weigh the resulting unfairness to the defendant if trial were to continue without the contested discovery. *Id.* The court may, for example, consider allowing the case to proceed with the notion that it will impose remedies during trial should the plaintiff continue to assert the privilege. Such remedies might include prohibiting the introduction of evidence on matters about which the plaintiff claims the privilege. *Id.* Alternatively, the court may permit the jury to make a negative inference from the assertion of the privilege. *Baxter v. Palmigiano*, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976).

Third, the court should weigh the option of delaying civil proceedings during the pendency of parallel criminal investigations or proceedings, considering the relevant statutes of limitation and any prejudice to the defendant resulting from such delay. *Denton*, 897 S.W.2d at 763.

Fourth, the court should recognize that it can impose sanctions in the future if any delay afforded the plaintiff resulted in unanticipated or extraordinary hardships. *Id.*

---

**2.** The quantity of diesel fuel found in the monitoring wells greatly exceeded the amount of fuel reported to have leaked from the underground storage tank. Convoy reported an inventory shortage of at least 145 gallons, but no more than 175 gallons. However, over 500 gallons of fuel were recovered from the monitoring wells.

Here, the trial court based its dismissal on the appellants' bad faith and refusal to comply with the discovery order. Sanctions so severe as to preclude presentation of the merits should not be assessed unless a party has displayed flagrant bad faith. *TransAmerican,* 811 S.W.2d at 919. Tampering with key evidence, indeed the only evidence, during litigation and then refusing to answer questions regarding that tampering seems to this Court to be the very definition of flagrant bad faith. Appellants were ordered to present themselves for deposition by a specific date, yet they refused to comply.

The discovery sought by appellees cannot be narrowed to avoid the self-incrimination dilemma. The information so essential to appellees' defense is the very information that appellants refuse to divulge. To allow the trial to continue without this discovery would be unjust. The privileged information forms the very basis for appellees' defense. Neither the rights of the individual, the dictates of public policy, nor the interests of justice would be served by allowing appellants to proceed to trial without divulging information they claim is privileged.

Nothing in the record suggests that an abatement would be effective to secure compliance. The State has apparently dismissed the criminal charges due to Mr. Marshall's mental state, and prosecution may now be barred by limitations. The Marshalls, however, did not indicate at trial, and have not suggested on appeal, that they will abandon the privilege. We find the trial court acted within its discretion, and we overrule appellant's second, third, and fifth points of error.

Appellants' remaining points of error concern the trial court's asserted failure to "test" lesser sanctions before dismissing the case. To be sure, the imposition of the "death penalty" as a first sanction is a drastic step. Generally, lesser sanctions must first be imposed. *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 850 (Tex.1992). In exceptional cases, determinative sanctions may be imposed in the first instance when they are clearly justified and no lesser sanction will promote compliance. *GTE Communications Sys. Corp. v. Tanner,* 856 S.W.2d 725, 729 (Tex.1993). By his own admission, Marshall poured diesel fuel down a monitoring well on June 3, 1993. Until he discloses how much diesel fuel he may have poured down the wells on other occasions, the appellees cannot formulate an adequate defense. Marshall's claim of privilege was considered and rejected by the trial court. Two appellate courts also examined the issue and refused to overturn the trial court's order. The Marshalls exhausted their legal remedies, but continued to defy the trial court. The Marshalls' conduct is nothing short of extraordinary, and we know of no effective sanction apart from a dismissal of the cause of action that would have been appropriate under the circumstances presented here. Appellants' first and fourth points of error are overruled.

Finding a direct relationship between appellants' fraudulent conduct, their offensive use of the Fifth Amendment privilege, and the sanction imposed, we do not find the sanction to be excessive under the facts of this case. The trial court's order of dismissal is affirmed.