Hipolito Ramos SANCHEZ and Alma Laura Galvan De Ramos, Both Individually and on Behalf of the ESTATE OF Hermes Hipolito Ramos GALVAN, Deceased, Appellants,

v.

BROWNSVILLE SPORTS CENTER, INC., Leon James, Honda Motor Co., Ltd., Honda R & D Co., Ltd., Honda R & D North America, Inc., Honda North America, Inc., and American Honda Motor Co., Inc., Appellees.

No. 13–97–436–CV.

Court of Appeals of Texas, Corpus Christi.

Feb. 8, 2001.

Opinion Granting Rehearing in Part Aug. 2, 2001

Rehearing Overruled Aug. 31, 2001.

Rehearing Overruled Sept. 6, 2001.

---

Audrey Mullert Vicknair, Paul W. Nye, Chaves, Gonzales & Hoblit, Corpus Christi, J.A. Magallanes, Magallanes, Sokat & Hinojosa, Brownsville, Robert C. Hilliard, Kevin W. Grillo, Hilliard, Grillo & Munoz, Corpus Christi, Robert S. Bennett, Houston, for appellants.

Craig A. Morgan, Richard Mccarroll, Mark Thomas Beaman, Brown, Mccarroll & Oaks Hartline, Jessie A. Amos, Douglas W. Alexander, Scott, Douglass & Mcconnico, Austin, Joseph A. Rodriguez, Eduardo R. Rodriguez, Rodriguez, Colvin & Chaney, Brownsville, for appellees.

Before Justices HINOJOSA, YAÑEZ, and RODRIGUEZ.

**OPINION**

Opinion by Justice HINOJOSA.

This is an appeal from a take-nothing judgment in a products liability case rendered in favor of appellees, Honda Motor Co., Ltd., Honda R & D Co., Ltd., Honda R & D North America, Inc., Honda North America, Inc., and American Honda Motor Co., Inc. (collectively "Honda"). Brownsville Sports Center, Inc. ("BSC") and Leon James were originally included as defendants in the case but pleadings against them were struck as a result of sanctions imposed against appellants, Hipolito Ramos Sanchez ("Mr.Ramos") and Alma Laura Galvan de Ramos ("Mrs.Ramos"), both individually and on behalf of the Estate of Hermes Hipolito Ramos Galvan, Deceased (collectively the "Ramoses"). The Ramoses challenge the judgment and the sanctions by nine points of error. Honda raises one cross-point to be addressed in the event the judgment is reversed. We affirm in part and reverse and render in part.

**A. BACKGROUND**

The product at issue in this case is a Honda three-wheel all-terrain vehicle ("ATV") which was designed and manufactured in Japan in 1983 by Honda Motor Company. The ATV was first shipped to American Honda in California, and in the summer of 1983, it was sent to a warehouse in Louisiana. Shortly thereafter, BSC, a Honda dealership, took title and arranged for delivery of the ATV to BSC's store in Brownsville, Texas. The vehicle was then sold to Texas Southmost College, also in Brownsville, which subsequently sold the vehicle. In approximately 1992, Mr. Ramos bought the ATV from a friend in Mexico, who may or may not have been the person that purchased the vehicle from the college. The ATV weighed 341 pounds, had a 192 cc engine, and could reach speeds of forty-four miles per hour.

On February 19, 1995, Mr. & Mrs. Ramos and their ten-year-old son, Hermes Hipolito ("Polito"), all citizens and residents of Mexico, attended a social gathering at a ranch near Matamoros, Tamaulipas, Mexico. During the afternoon, Mr. Ramos allowed Polito and others to go to the family home to bring the ATV to the ranch. Polito had been riding the ATV, with his father or alone, since he was six or seven years old. Shortly after returning to the ranch with the ATV, Polito was fatally injured when he lost control of the vehicle.

The Ramoses sued Honda, BSC, and its owner, Leon James, for the wrongful death of Polito, alleging causes of action for negligence, gross negligence, and products liability. Appellees generally denied the allegations and asserted the affirmative defense of contributory negligence on the part of Polito and his parents. Appellees also moved the trial court to apply Mexican law to the case. After a hearing, this motion was denied. On the day jury

selection was to commence, the appellees moved for sanctions against the Ramoses because of discovery violations. The trial court granted the sanctions, striking the pleadings asserted against BSC and James. At the conclusion of the appellants' evidence, the trial court granted a directed verdict as to a survival cause of action and gross negligence and exemplary damages claims. When the evidence was concluded, the jury found the ATV was defective in marketing and design and that such defects were the proximate cause of Polito's death. The jury also found the negligence of Honda and each of the Ramoses was the proximate cause of the injuries suffered by Polito. Liability was assessed at 33⅓% for Honda and for each of the Ramoses. Although the jury awarded $15,000,000 to each of the Ramoses, the trial court subsequently rendered a take-nothing judgment against them.

## B. SUFFICIENCY OF THE EVIDENCE

By their first point of error, the Ramoses contend the trial court erred in denying their motion to disregard jury findings of negligence, proximate cause, and liability percentage against them because the evidence was legally and factually insufficient to support the verdict as to those issues.

■■■ When we review a legal sufficiency of the evidence point of error, we must consider all the evidence in a light favorable to the party in whose favor the verdict was rendered, and every reasonable inference raised by the evidence is to be indulged in that party's favor. *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998); *Hines v. Comm'n for Lawyer Discipline*, 28 S.W.3d 697, 701 (Tex.App.— Corpus Christi 2000, no pet.). A legal sufficiency point may only be sustained when the record discloses: (1) a complete absence of evidence of a vital fact; (2) the

court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; and (4) the evidence established conclusively the opposite of the vital fact. *Juliette Fowler Homes, Inc. v. Welch Assoc.*, 793 S.W.2d 660, 666 n. 9 (Tex.1990). If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *Formosa Plastics*, 960 S.W.2d at 48; *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is not more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983). The test for the application of this no evidence/scintilla rule is: if reasonable minds cannot differ from the conclusion, then the evidence offered to support the existence of a vital fact lacks probative force, and it will be held to be the legal equivalent of no evidence. *Id.; Hines*, 28 S.W.3d at 701.

■■■ When we review a factual sufficiency point of error, we consider, weigh, and examine all of the evidence which supports or undermines the jury's finding. *Plas-Tex, Inc. v. United States Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). We review the evidence, keeping in mind that it is the jury's role, not ours, to judge the credibility of the evidence, to assign the weight to be given to testimony, and to resolve inconsistencies within or conflicts among the witnesses' testimony. *Corpus Christi Teachers Credit Union v. Hernandez*, 814 S.W.2d 195, 197 (Tex.App.—San Antonio 1991, no writ). We then set aside the jury's finding only when we find that the evidence standing alone is too weak to support the finding or that the finding is so against the overwhelming weight of the

evidence that it is manifestly unjust and clearly wrong. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

■ The evidence in this case shows that ten-year-old Polito was allowed to return home to pick up the ATV without his parents' supervision. The parents were unaware when the ATV arrived on ranch property, and again, Polito was not supervised by his parents as he rode the vehicle. The parents had not checked the ranch terrain for rideability on the day of the accident.

Polito was not admonished to bring a helmet to the ranch, and at the time of the accident, he was not wearing one. Although his parents testified Polito almost always wore a helmet when he rode the ATV, they could not produce the helmet or proof of its purchase. Testimony reflects that if Polito had been wearing a helmet, his injuries would most likely not have been fatal or even severe.

Although neither parent was familiar with operating the ATV at the time of its purchase, they never attempted to get an owner's manual to learn the suggested operation guidelines. They did not know the recommended air pressure for the tires, even though the information was stated on the tires. Indeed, the air pressure had never been checked from the time the ATV was purchased by the Ramoses. On the day at issue, the tire air pressure was at least five times the recommended level, causing the tires to bounce over obstacles rather than fold around them as tires at the recommended lower air pressure would do. At the time of the accident, Mr. Ramos knew the handlebar brakes were malfunctioning.

In Mexico, an ATV is considered a motorcycle. To operate a motorcycle, one must have a license, which is obtainable at age sixteen. An ATV operator is required to wear a helmet and protective eyewear. The uncontroverted evidence indicates these Mexican laws apply whether the rider is on public or private property.

We hold the above evidence is legally sufficient to support the jury's verdict that the Ramoses' negligence was the proximate cause of the accident and that their liability was 33⅓% each. Considering the remainder of the evidence, which deals for the most part with the design, testing, manufacture, and marketing of the ATV at issue, together with some evidence of a probability Polito would have died even if he was wearing a helmet, we conclude the jury's finding is not so against the overwhelming weight of the evidence that it is manifestly unjust and clearly wrong. We overrule appellants' first point of error.

### C. THE TAKE-NOTHING JUDGMENT

■ In their second point of error, the Ramoses allege the trial court erred in entering a take-nothing judgment based on the verdict. The jury found Honda and each of the Ramoses negligent and that such negligence was the proximate cause of Polito's death. The jury also found the ATV was defectively designed and marketed and that the defects were the proximate cause of the accident. Responsibility was apportioned at 33⅓% against each of the Ramoses and Honda. In rendering a take-nothing verdict, the trial court apparently combined the percentages assessed against the Ramoses and determined that because their collective responsibility totaled more than sixty percent, the Ramoses were not entitled to a recovery.

The Ramoses contend it was error for the trial court to add the percentages of multiple claimants to bar recovery. They base this contention on language found in the civil practice and remedies code regarding comparative responsibility. They

argue that no statutory language, case law, or other legal basis exists for combining separate claimants' percentages to reach the sixty percent bar. The Ramoses claim this is true because the negligence of one spouse or parent cannot be imputed to the other absent special circumstances not at issue here. According to the Ramoses, they should each be allowed to recover since the percentage assigned to each was less than sixty percent. They agree each of their recoveries as provided by the jury should be reduced by 33⅓%, which is the percentage of responsibility assessed against each. The Ramoses further contend Honda should be jointly and severally liable for the remaining two-thirds of the jury award, despite the fact that Honda's percentage of responsibility was only 33⅓% and no other defendant was found liable.

Honda challenges the Ramoses' interpretation of the relevant statutory language. Appellees contend the Ramoses did not submit a proper jury question on the issue and must now be treated as a single claimant. Honda argues that the Ramoses' duty to supervise Polito was a collective responsibility and must be treated as such when apportioning the awarded damages. Finally, Honda takes exception with the Ramoses' proposal to make the appellees jointly and severally responsible for more than their assigned percentage of responsibility.

A judgment shall be rendered to give parties all the relief they are entitled to either in law or equity. TEX.R.CIV.P. 301. Therefore, the issue before us is whether the trial court's judgment provides the Ramoses with all the relief to which they are entitled under chapter 33 of the Texas Civil Practice and Remedies Code.

At the time of Polito's death, the civil practice and remedies code provided that when at least one defendant was found liable on a basis of strict products liability, a claimant could recover for personal injury only if his percentage of responsibility was less than sixty percent. Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.04, 1987 Tex.Gen.Laws 77 78 (amended 1995) (current version at TEX.CIV.PRAC. & REM. CODE ANN. § 33.001 (Vernon 1997)). A claimant was a party seeking recovery of damages, and if the recovery sought was for the death of another person, claimant included the other person as well as the party seeking recovery. Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.07, 1987 Tex.Gen.Laws 79 (amended 1995) (current version at TEX.CIV.PRAC. & REM. CODE ANN. § 33.011(1) (Vernon 1997)). The trier of fact was to determine the percentage of responsibility for each claimant, each defendant, and each settling person. Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.06, 1987 Tex.Gen.Laws 78– 79 (amended 1995) (current version at TEX. CIV.PRAC. & REM.CODE ANN. § 33.003 (Vernon 1997)). Percentage of responsibility was that percentage attributed to each claimant, each defendant, or each settling person with respect to causing or contributing to the cause in any way. Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.07, 1987 Tex.Gen.Laws 79 (amended 1995) (current version at TEX.CIV.PRAC. & REM. CODE ANN. § 33.011(4) (Vernon 1997)). The amount of damages due a claimant not barred from recovery must be reduced by the percentage of responsibility assessed him. Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.08, 1987 Tex.Gen.Laws 80 (amended 1995) (current version at TEX. CIV.PRAC. & REM.CODE ANN. § 33.012(a) (Vernon 1997)).

 If a statute is clear and unambiguous, extrinsic aids and rules of statutory construction are inappropriate and the statute should be given its common everyday meaning. *Cail v. Service Motors, Inc.,*

660 S.W.2d 814, 815 (Tex.1983). Unless a statute is ambiguous, we must follow the clear language of the statute. *Republic-Bank Dallas v. Interkal, Inc.,* 691 S.W.2d 605, 607 (Tex.1985).

■■■ After reviewing· the applicable statutes, we find the intent of chapter 33 to be clear and unambiguous. Although only one cause of action exists in this wrongful death case, each of the parents is entitled to recover for the wrongful death of their son. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 71.004(a), (b) (Vernon 1997); *Avila v. St. Luke's Lutheran Hosp.,* 948 S.W.2d 841, 850 (Tex.App.—San Antonio 1997, writ denied). As they are each entitled to recover, each of the Ramoses is a claimant for the purposes of the civil practice and remedies code. *See Seminole Pipeline Co. v. Broad Leaf Partners, Inc.,* 979 S.W.2d 730, 752 (Tex.App.—Houston [14th Dist.] 1998, no pet.) (determining who was a claimant under the civil practice and remedies code for the purpose of calculating punitive damages). Each one of the Ramoses should have recovered the amount of damages apportioned to them by the jury and reduced by their respective percentages of responsibility.

■■■ In this case, however, the trial court erroneously combined their percentages of responsibility and barred their recovery because the total percentage exceeded sixty percent. We find no support for the trial court's action, either in the language of the statute or in case law. A fair reading of the relevant statutory provisions precludes combining percentages for claimants to bar recovery, just as it bars combining defendants' percentages to determine if joint and several liability is appropriate. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.08, 1987 Tex.Gen. Laws 80 (amended 1995) (current version at TEX.CIV.PRAC. & REM.CODE ANN. § 33.012(a) (Vernon 1997)) (amount of damages due *a claimant* must be reduced

by the percentage of responsibility assessed *him*); Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.09, 1987 Tex.Gen. Laws 81 (amended 1995) (current version at TEX.CIV.PRAC. & REM.CODE ANN. § 33.013 (Vernon 1997)) (*each liable defendant* is jointly and severally liable for recoverable damages if percentage of responsibility attributed to the *defendant* is greater than twenty percent). While the better practice might have been to submit a separate percentage question for each claimant, *see* COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—MALPRACTICE, PREMISES & PRODUCTS, PJC 71.11 (1998), the civil practice and remedies code does not provide a specific format for jury charge questions. *Dico Tire, Inc. v. Cisneros,* 953 S.W.2d 776, 797 (Tex. App.—Corpus Christi 1997, writ denied). The section merely states how responsibility is to be apportioned. *Id.*

We hold the trial court erred in rendering a take-nothing verdict under applicable Texas law. We sustain appellants' second point of error.

### D. APPORTIONMENT OF DAMAGES

Mr. Ramos, Mrs. Ramos, and Honda were each assigned 33⅓% of the responsibility. The jury awarded Mr. Ramos and Mrs. Ramos each fifteen million in damages. In accordance with Texas Civil Practice and Remedies Code section 33.012, appellants contend their recovery should be reduced to ten million each because of the consideration of their respective percentages of responsibility. We disagree.

■■■ Section 33.012 provides: "If the claimant is not barred from recovery under § 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's

percentage of responsibility." *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.08, 1987 Tex.Gen.Laws 80 (amended 1995) (current version at Tex.Civ.Prac. & Rem.Code Ann. § 33.012(a) (Vernon 1997)).[1]

 As set forth in *Haney Elec. Co. v. Hurst,* 624 S.W.2d 602, 611–612 (Tex. Civ.App.—Dallas 1981, writ dism'd w.o.j.), the claim for damages of each plaintiff must be considered as if it were presented in a separate suit and "the damages awarded in proportion to the amount of negligence of each plaintiff as compared to the negligence of the defendants, without considering the negligence of the other plaintiff." *Haney Elec.,* 624 S.W.2d at 611.

The scheme of the statute is to compare each plaintiff's negligence to the negligence of the party or parties from whom he seeks recovery, and if the plaintiff's negligence is not greater than theirs, the statute requires the recovery to be "diminished in proportion to the amount of negligence attributed to the person or party recovering" rather than according to the "percentage" of negligence. We interpret this provision to mean that the recovery is diminished in the proportion that plaintiff's negligence bears to the combined negligence of plaintiff and the party or parties against whom he seeks recovery.

*Id.* at 612.

In this case, the percentage of responsibility of Mr. Ramos (33⅓%) is equal to the percentage of responsibility of Honda (33⅓%); and the percentage of responsibility of Mrs. Ramos (33⅓%) is equal to the percentage of responsibility of Honda 33⅓%). Thus, the proportion by which each appellant's recovery is diminished is by fifty percent. Consequently, each plaintiff is entitled to recover one-half of his damages. As explained by the Dallas court of appeals, the "jury's findings represent the proportions of negligence of each plaintiff as compared to that of the defendants, and that these proportions would have been substantially the same, if submitted to the same jury, whether or not the negligence of the other plaintiff had been submitted." *Id.* at 613. Therefore, each plaintiff may recover one-half of the $15 million awarded by the jury, or $7.5 million each in damages.

 Appellants further contend that Honda[2] is jointly and severally liable for the damages awarded to them. We agree.

Section 33.013(b)(1) of the Texas Civil Practice and Remedies Code provides that: "each liable defendant is, in addition to his liability under Subsection (a), jointly and severally liable for the damages recoverable by the claimant under section 33.012 with respect to a cause of action if the percentage of responsibility attributed to the defendant is greater than 20 percent." *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.09, 1987 Tex.Gen.Laws 81 (amended 1995) (current version at Tex. Civ.Prac. & Rem.Code Ann. § 33.013 (Vernon 1997)). Therefore, we hold "Honda" is

---

**1.** Section 33.001(b) provided: "In an action to recover damages for personal injury, property damage, or death in which at least one defendant is found liable on a basis of strict tort liability, strict products liability, or breach of warranty under Chapter 2, Business and Commerce Code, a claimant may recover damages only if his percentage of responsibility is less than 60 percent." *See* Act of June 3, 1987, 70th Leg., 1st C.S., § 2.04,

1987 Tex.Gen.Laws 77 (amended 1995) (current version at Tex.Civ.Prac. & Rem.Code Ann. § 33.001 (Vernon 1997)).

**2.** As stated in the jury charge, " 'Honda' means the Defendants, Honda Motor Co., Ltd., their officers, agents and employees acting in the course and scope of their employment."

jointly and severally liable for the damages awarded to the Ramoses.

### E. BROWNSVILLE SPORTS CENTER AND JAMES

By their third point of error, the Ramoses contend the trial court abused its discretion by striking the claims they asserted against BSC and James in violation of the guidelines set forth in *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913 (Tex.1991).

Key to the Ramoses case against BSC and James were Mr. Ramos's allegations that he visited BSC twice before deciding to purchase the ATV from his friend. At the time of the visits, Honda expected its dealers to provide safety information to prospective customers. Such information included the minimum operator age recommended for each style of ATV manufactured by Honda. Mr. Ramos alleged that when he informed the salesperson at BSC he intended to purchase an ATV for his son, he was not asked the child's age or informed of the recommended minimum ages.

Approximately ten days before trial commenced, four men were observed by Thomas James, son of BSC owner Leon James, as they got out of a van parked at the BSC store. Two men entered the store, and one with a tablet looked about the store, apparently taking notes on what he saw there. Thomas approached the men and was told that one of the men outside the store wanted to purchase something. Thomas went outside, and one man asked the price of a TRX Honda 90. When he was told the man might want to purchase the vehicle for his six-year old son, Thomas told him the vehicle could not be sold for use by a child younger than twelve years of age. The men then left the store. Several days later, attorneys for the appellees were in the store, and

Thomas told them about the incident. When Thomas described the man interested in purchasing an ATV, the attorneys realized the man could be Robert Hilliard, counsel for the Ramoses.

Appellees filed a motion to disqualify the Ramoses' counsel and to exclude evidence supporting Mr. Ramos's allegations against BSC and James. A hearing on the matter was held just prior to jury selection. Thomas identified Hilliard as the person interested in purchasing an ATV. He also identified John Flood, an attorney from Hilliard's firm. Hilliard identified the other two men as Aaron Arnold, a college student working at the firm, and Bobby Canales, an acquaintance of the Ramoses who at Hilliard's direction would communicate with them. Hilliard claimed to be unsure of what notes were taken during the visit other than a hotline phone number. The notes were not presented to the trial court. Hilliard admitted he did not introduce himself to Thomas or claim to be counsel for the Ramoses. He also admitted his failure to contact defense attorneys before visiting the BSC store, confirmed his conversation with Thomas regarding an ATV for his six-year-old son, and conceded that a party has a fundamental right to have his attorney present when confronted by opposing counsel. At the end of the hearing, the trial court struck the pleadings against BSC and James. The judge stated he was very disturbed with the actions of appellants' counsel.

■■■ No findings of fact and conclusions of law were requested or made part of the record. Thus, we must presume, unless the evidence fails to support the imposition of sanctions, that the trial court's decision was proper. *See Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 83 (Tex.1992).

A trial court may impose sanctions on any party abusing the discovery process while seeking or making discovery. TEX.R.CIV.P. 215.3; *see Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex. 1986) (per curiam); *In re Zenergy, Inc.*, 968 S.W.2d 1, 9 (Tex.App.—Corpus Christi 1997, orig. proceeding). Discovery sanctions imposed by a trial court are within the court's discretion and will be set aside only for a clear abuse of discretion. *Bodnow Corp.*, 721 S.W.2d at 840; *Zenergy*, 968 S.W.2d at 9. Abuse of discretion occurs when the trial court fails to act with reference to any guiding rules and principles, *i.e.*, whether the court's act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985); *Zenergy*, 968 S.W.2d at 9. If the sanctions imposed are not just, a trial court abuses its discretion. *TransAmerican*, 811 S.W.2d at 917; *Zenergy*, 968 S.W.2d at 9; *see* TEX.R.CIV.P. 215.2(b).

Whether sanctions are just is measured by two standards. *TransAmerican*, 811 S.W.2d at 917. First, a direct relationship must exist between the offensive conduct and the sanction imposed. *Id.; Zenergy*, 968 S.W.2d at 9; *Lanfear v. Blackmon*, 827 S.W.2d 87, 90 (Tex.App.—Corpus Christi 1992, orig. proceeding). In this regard, the trial court should attempt to determine if the offensive conduct is attributable to the attorney, the party, or both. *Zenergy*, 968 S.W.2d at 9; *Lanfear*, 827 S.W.2d at 90. Second, the sanctions must fit the crime; they must not be excessive. *TransAmerican*, 811 S.W.2d at 917; *Zenergy*, 968 S.W.2d at 9; *Lanfear*, 827 S.W.2d at 90. Sanctions which are so severe that they preclude presentation on the merits should not be assessed absent a party's bad faith or counsel's flagrant disregard for the responsibilities of discovery under the rules. *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex.1992); *Zen-*

*ergy*, 968 S.W.2d at 9; *Lanfear*, 827 S.W.2d at 90. Discovery sanctions should not be used to adjudicate the merits of a claim or defense unless a party's obstruction of the discovery process justifies the presumption that the claim or defense lacks merit. *TransAmerican*, 811 S.W.2d at 918; *Zenergy*, 968 S.W.2d at 9; *Lanfear*, 827 S.W.2d at 90. Even then, lesser sanctions should be tested first to determine whether they are adequate to secure compliance, deterrence, and punishment of the offender. *Hamill v. Level*, 917 S.W.2d 15, 16 n. 1 (Tex.1996) (per curiam); *Chrysler*, 841 S.W.2d at 849; *Zenergy*, 968 S.W.2d at 9. However, in exceptional situations, determinative sanctions may be imposed in the first instance when they are clearly justified and no lesser sanctions will promote compliance. *GTE Communications v. Tanner*, 856 S.W.2d 725, 729 (Tex.1993); *Zenergy*, 968 S.W.2d at 9; *Marshall v. Ryder Sys., Inc.*, 928 S.W.2d 190, 197 (Tex.App.—Houston [14th Dist.] 1996, writ denied); *see TransAmerican*, 811 S.W.2d at 919.

Appellants contend the first standard for determining appropriate sanctions was not satisfied because the trial court's actions punish the Ramoses for their counsel's violations of the disciplinary rules. *See* TEX.DISCIPLINARY R. PROF'L CONDUCT 4.02(a), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 1998) (TEX.STATE BAR R. art. X, § 9) (lawyer shall not communicate with represented party without permission of other lawyer). Although Hilliard and Flood explicitly violated a disciplinary rule, they also conducted improper discovery. The rules for proper discovery implicitly include the State Bar's rules for professional conduct. Hilliard may have acted on his own, but his conduct went to the very core of the Ramoses' allegations against BSC and James. While Hilliard's

actions may not have achieved the desired results, details about the store and its employees could have been conveyed by the attorneys and Canales to make Mr. Ramos's testimony more factually believable. Thus, we cannot say the trial court abused its discretion by attributing the misconduct to the appellants and their attorneys.

■■■ Appellants also argue the sanction imposed was excessive. When a party seeking or making discovery violates the process, however, the trial court may impose one of six sanctions. *See* TEX. R.CIV.P. 215.3. Three of these sanctions are: (1) disallowing further discovery; (2) charging discovery expenses against the appellants or their attorneys; and (3) charging reasonable expenses, including attorneys fees, caused by the improper conduct against the appellants or their attorneys. *See* TEX.R.CIV.P. 215.2(b)(1), (2), (8) and 215.3. In the case before us, imposing one of these three sanctions would have done little to restore the integrity of the cause of action against BSC and James. Nor would these sanctions deter similar future conduct. The hearing on the sanctions motion was held on the day trial commenced and absolutely ended the discovery process. Any expenses incurred by the appellees because of the improper conduct would likely be minimal.

The remaining available sanctions are: (a) matters or facts be deemed established favorably to the appellees; (b) appellants not be allowed to support designated claims or to present evidence on designated matters; and (c) striking of appellants' pleadings or parts of pleadings. *See* TEX. R.CIV.P. 215.2(b)(3), (4), (5) and 215.3. These sanctions have the desired effects of correcting any unfairness caused by the discovery violation at issue and deterring any future conduct of this nature. While the first two sanctions appear to be less devastating to the Ramoses' claims, the outcome with either would be no different than that caused by the third sanction. Either (a) or (b) would have precluded a jury issue on appellants' claims against BSC and James, which is exactly the effect of (c).

The most significant allegations in this case were those leveled against the Honda appellees, which the trial court did not strike. Only those portions of the pleadings potentially affected by the improper conduct were struck. The incident can hardly be described as accidental because Hilliard and the others involved traveled from Corpus Christi to BSC's store in Brownsville. The attorneys clearly knew the appropriate procedure for confronting the opposition. The conduct reflects a callous disregard for established judicial procedures. Given the proximity of the conduct to the beginning of trial, the nature of the conduct, the potential for unfair prejudice to the appellees, and the lack of lesser sanctions which might deter the conduct, we hold the trial court did not abuse its discretion by striking appellants' pleadings against BSC and James. We overrule appellants' third point of error.

### F. EXCLUSION OF EVIDENCE

In their fourth and sixth points of error, the Ramoses contend the trial court erred in excluding evidence from the Consumer Product Safety Commission, the consent judgment signed by Honda, and the testimony of Mr. Ramos regarding statements made to him by BSC.

■■■ The admission and exclusion of evidence is committed to the trial court's sound discretion. *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). A trial court abuses its discretion when it acts without regard for any guiding rules or principles. *City of Browns-*

*ville v. Alvarado,* 897 S.W.2d 750, 754 (Tex.1995); *Downer,* 701 S.W.2d at 241–42.

██ To obtain reversal of a judgment based on error in the admission or exclusion of evidence, appellant must show that the trial court did in fact commit error, and that the error probably caused the rendition of an improper judgment. TEX. R.APP.P. 44.1(a)(1); *McCraw v. Maris,* 828 S.W.2d 756, 758 (Tex.1992); *Gee,* 765 S.W.2d at 396; *Downen v. Texas Gulf Shrimp Co.,* 846 S.W.2d 506, 512 (Tex. App.—Corpus Christi 1993, writ denied).

██ In their fourth point of error, the Ramoses assert that in order to establish product liability defects and punitive damages, they attempted to offer evidence generated by the United States Consumer Products Safety Commission regarding three-wheelers manufactured by Honda. In order to complain on appeal that the trial court erroneously excluded evidence, an appellant must show that he tendered the evidence before the trier of fact and obtained an adverse ruling thereon. *Lakeway Land Co. v. Kizer,* 796 S.W.2d 820, 827 (Tex.App.—Austin 1990, writ denied). In the instant case, the record shows that Honda moved to exclude evidence relating to the Congressional and Consumer Product Safety Commission Investigations of all-terrain vehicles, the consent decrees terminating ATV litigation, and the report of the NAAG Task Force. A hearing was held on this pre-trial motion on February 10, 1997. At the end of the hearing, the judge stated, "All right—I will read these over and let you know what I'm going to do when you come on Tuesday morning." There is no evidence in the record of the trial judge's decision. During jury selection, the following exchange occurred that reveals that an in-chambers discussion of the motion took place:

Appellees' Attorney: I would like to move to hold Mr. Bennett in contempt because he violated what the Court told him not to do *back in the chambers* and said to this jury that ATVs have been banned, which is not true. There was a consent decree by which the parties agreed that they would not manufacture them anymore, but he deliberately said that and did it really three times, and there is nothing that we can do about it. Now, the jury probably thinks they have been banned. The Court has denied the motion for a mistrial, which I would like to reurge. I would also like—I ask that Mr. Bennett be held in contempt for doing that.

Appellants' Attorney: May I be heard, Your Honor?

The Court: Surely.

Appellants' Attorney: Your Honor, I guess that I'm trying to—There is no question that I am trying to follow the Court's instructions as carefully as I can. In my mind I see a different issue dealing with the CPSC. The Court said—*The Court said in chambers that we are not going to go into the CPSC. Now, I didn't understand from the Court if it meant also the consent decree—*

The Court: Well, the consent decree was certainly a part of that. I will accept your word for it that you didn't understand it, but please understand it from this time forward.

Appellants' Attorney: May I just make one other statement, Your Honor?

The Court: All right.

Appellants' Attorney: A point of inquiring of the Court. *There are certain documents involving the CPSC hearings and government findings. There is also the consent decree. And then there are other documents involving the congressional inquiries. Now, all*

*these documents we will have witnesses coming to explain those. As I understand the ruling of the Court at this time, until we have these experts on the stand and testifying about these documents, the CPSC findings, the consent decree, and congressional findings, we shouldn't say anything about that.* I certainly—

The Court: *That is correct. Before you put them on the stand I suspect you better approach the Court and let's talk about it.*

Appellants' Attorney: Yes, sir, we will be happy to do that.

Before concluding their case, appellants once again asked the judge to consider the evidence:

Appellants' Attorney: Judge, we first have a motion for the court to reconsider the testimony of CPSC, the congressional hearings, the consent decree and the close consent decree government actions.

The Court: Which will be denied.

Appellants never attempted to tender the evidence concerning the CPSC, the congressional hearings, or the consent decree as directed by the judge after jury selection. The situation appears analogous to the granting of a motion in limine; the trial judge wanted appellants to approach the bench and ask for a ruling regarding the evidence that they wanted to introduce. A review of the record shows that appellants never attempted to present this evidence. Rather, they simply made a verbal motion to reconsider the testimony which was denied by the trial judge. This denial was a reiteration of his previous explanation that appellants would need to "approach the Court" to talk about the evidence before they attempted to put on the evidence.

Therefore, we conclude the claimed error regarding the CPSC, congressional hearings, and consent decree evidence was not preserved for appellate review because appellants failed to offer the evidence during the trial itself and obtain a ruling thereon. Appellants' fourth point of error is overruled.

 In their sixth point of error, the Ramoses contend the trial court erred by excluding the testimony of Mr. Ramos concerning statements made to him by BSC. Specifically, the Ramoses wanted the trial court to allow testimony that Mr. Ramos "informed BSC that he was looking for an ATV for his son, but no one told him his son should not ride the ATV, no one told him (as required under the Consent Decree) that there are age restrictions for riding an ATV, and no other warnings required by the Consent Decree were given to Mr. Sanchez."

During the direct examination of Mr. Ramos, the following exchange occurred:

Appellants' Attorney: And when you went there the first time, was it only to look or did you think you might want to receive any materials?

Mr. Ramos: The first time I went in was just to observe. I had not decided yet what I was going to purchase.

Appellants' Attorney: Did you go again another time after you decided what you were going to purchase?

Mr. Ramos: I went already directly on this type of motorcycle or the one that had four wheels. I asked for the prices, they gave them to me, and then I left.

Appellants' Attorney: When you asked for the prices, did you tell anyone that you were considering buying it for Polito, your son?

Appellees' Attorney: Objection. He's already testified what he said. This is leading, Your Honor.

The Court: Sustained.

Appellants' Attorney: As to leading or—

The Court: The objection was sustained, Counsel.

Appellants' Attorney: I will rephrase it, Judge.

Appellants' Attorney: When you went to the dealership, did you speak with anyone?

Mr. Ramos: Yes, a person helped me.

Appellants' Attorney: And what did you tell that person about why you were there?

Appellees' Attorney: Objection, asked and answered already.

The Court: Asked and answered. Sustained.

Appellants' Attorney: If I may be heard briefly, Judge?

The Court: No, just go right ahead.

Appellants' Attorney: When you were talking to the person that you already told us about, did you tell this person about your desire to buy the bike for your son?

Appellees' Attorney: Objection. Leading and asked and answered.

The Court: Sustained.

Appellants' Attorney: *I will move on. Judge, but with the Court's permission at another time, I would like to, outside the presence of the jury, just make a bill on this one thing, please.*

Appellants' Attorney: Mr. Ramos, let's talk about something else for a few minutes. Do you remember how much Honda wanted for one of these at the time?

■■■ The burden is on the complaining party to present a sufficient record to the appellate court to show error requiring reversal. Tex.R.App.P. 33.1(a). To preserve error in the exclusion of evidence, a party must make the following showing:

(1) attempt during the evidentiary portion of the trial to introduce the evidence; (2) if an objection is lodged, specify the purpose for which the evidence is offered and give the trial judge reasons why the evidence is admissible; (3) obtain a ruling from the court; and (4) if the judge rules the evidence is inadmissible, make a record, through a bill of exceptions, of the precise evidence the party desires admitted.

*Estate of Veale v. Teledyne Indus., Inc.,* 899 S.W.2d 239, 242 (Tex.App.—Houston [14th Dist.].1995, writ denied).

While the Ramoses did appear to attempt to introduce evidence about Mr. Ramos's visit to BSC, they failed to specify the purpose for which the evidence was offered once Honda objected to the testimony. By not arguing with sufficient specificity to give the trial court an opportunity to rule on whether the evidence was admissible, the Ramoses failed to preserve their complaint for our review. *See* Tex. R.App.P. 33.1(a). Appellants' sixth point of error is overruled.

### G. Bill of Exceptions

In their fifth point of error, the Ramoses complain the trial court erred by failing to allow them to submit formal or informal bills of exceptions regarding the evidence excluded in points four and six. Specifically, the Ramoses argue that:

when Plaintiffs attempted to put on a bill through a witness who was leaving town to prove up these documents and related information, the trial court refused to allow Plaintiffs to do so. Plaintiffs filed a Motion to Reconsider the Court's Exclusion of Relevant Evidence, which was once again denied. Plaintiffs subsequently attempted to get orders approving said bills signed by agreement.

Concerning the testimony of Mr. Ramos, appellants assert that:

> after the court informally and formally declared he would deprive Appellants of their right to prove up an informal Bill of Exceptions, Appellants again offered the Affidavit as part of the Bill of Exception.

 In their first bill of exception, the Ramoses present the testimony of Mr. Ramos about his visit to BSC. As we stated above, the trial court did not rule on the evidence and appellants did not preserve the complaint for our review. Therefore, we will also not review this complaint. *See* TEX.R.APP.P. 33.2(a).

 In their third bill of exception, appellants attempt to bring forth the CPSC and consent decree evidence. The bill of exception states:

> The Honda Defendants filed a motion to exclude evidence relating to the Congressional and Consumer Products Safety Commission Investigations of All Terrain Vehicles, the Consent Decrees Terminating ATV Litigation, and the Report of the NAAG Task Force. A hearing was held before Judge Hester on February 10, 1997. The court granted that motion and excluded testimony that would have been offered by plaintiffs regarding that subject.

The Ramoses have mischaracterized the action taken by the court. As we stated in point of error four, the record reflects the trial court did not exclude the testimony, but rather required appellants to confer with the court before allowing the witnesses to testify. Appellants did not attempt to present the evidence. Therefore, even though appellants have provided a bill of exception, they have not preserved this complaint for appellate review.

The Ramoses' second bill of exception concerned the testimony of Dr. Ed Karnes which was refused by the trial court. In their brief, appellants contend:

> Counsel for [appellees] chastised Karnes: "You think you know more about the risks associated with ATV's than the people who actually ride them, do you?" When Dr. Karnes emphatically stated that he did, under the Court's ruling he was unable to cite the thousands of pages of documentation, studies, reports and statistics throughout the CPSC and Congressional materials that he has read, understands and relied upon in answering [appellees'] question.

As we stated above, appellants, regardless of their bill of exception and their allegation of the importance of the CPSC and Congressional materials, have not preserved this complaint for our review.

 Appellants also complain the trial court did not allow them to make a bill on a witness that was leaving town. At the end of Dr. Karnes's testimony and as the trial court was recessing for the day, appellants asked the court if they could have a moment outside the presence of the jury. The court asked for what purpose, and counsel indicated "to make a bill, Your Honor, on our witness who is leaving tonight and has to leave." The court denied appellants' request.

A review of the record shows that appellants never tried to make a formal bill of exception on this witness. *See* TEX. R.APP.P. 33.2; *Houston Lighting & Power Co. v. Russo Properties, Inc.,* 710 S.W.2d 711, 717 (Tex.App.—Houston [1st Dist.] 1986, no writ) (citing *State v. Biggers,* 360 S.W.2d 516, 517 (Tex.1962) (where trial court commits error in refusing bill of exception, the error will not result in reversal unless it amounted to such denial of appellants' rights as was reasonably calculated to cause, and probably did cause, rendition of an improper judgment)).

Therefore, appellants have waived their complaint.

Appellants' fifth point of error is overruled.

## H. DIRECTED VERDICT

■ In their seventh point of error, the Ramoses contend the trial court erred by granting a directed verdict regarding survivor claims and survivor damages for the decedent, Hermes Hipolito Ramos Galvan.

■ A court may instruct a verdict if no evidence of probative force raises a fact issue on the material questions in the suit. *See Szczepanik v. First S. Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994). A directed verdict for a defendant may be proper in two situations. First, a court may direct a verdict when a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery. *The Prudential Ins. Co. of Am. v. Financial Rev. Servs., Inc.,* 29 S.W.3d 74, 77 (Tex.2000) (citing *Latham v. Castillo,* 972 S.W.2d 66, 67–68, 70–71 (Tex.1998)). Second, a trial court may direct a verdict for the defendant if the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *See Villegas v. Griffin Indus.,* 975 S.W.2d 745, 748–49 (Tex.App.—Corpus Christi 1998, pet. denied); *Davis v. Mathis,* 846 S.W.2d 84, 86 (Tex.App.—Dallas 1992, no writ). On review, we examine the evidence in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences. *Qantel Bus. Sys. v. Custom Controls,* 761 S.W.2d 302, 303–04 (Tex.1988); *Villegas v. Griffin Indus.,* 975 S.W.2d 745, 749 (Tex. App.—Corpus Christi 1998, pet. denied). When reasonable minds may differ as to the truth of controlling facts, the issue must go to the jury. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex.1978); *Villegas,* 975 S.W.2d at 749.

■ A decedent's personal injury action survives death and may be prosecuted on his behalf. TEX.CIV.PRAC. & REM.CODE ANN. § 71.021(a) (Vernon 1997). The purpose of the Texas Survival Act is to continue a decedent's cause of action beyond death to redress decedent's estate for decedent's injuries. *Felan v. Ramos,* 857 S.W.2d 113, 118 (Tex.App.—Corpus Christi 1993, writ denied) (citing *Russell v. Ingersoll–Rand Co.,* 795 S.W.2d 243, 245 (Tex.App.—Houston [1st Dist.] 1990), aff'd, 841 S.W.2d 343 (Tex.1992)). Thus, a cause of action for personal injury does not abate because of the death of an injured person. TEX.CIV.PRAC. & REM.CODE ANN. § 71.021(a) (Vernon 1997). Rather, the personal injury action survives the injured person's death and may be prosecuted on his behalf. TEX.CIV.PRAC. & REM.CODE ANN. § 71.021(b) (Vernon 1997); *Russell,* 841 S.W.2d at 344–45.

■ The actionable wrong in a survival action is that which the decedent suffered before death. *Russell,* 841 S.W.2d at 345 (citing *Landers v. B.F. Goodrich Co.,* 369 S.W.2d 33, 35 (Tex. 1963)). The damages recoverable are those which the decedent sustained while alive. *Id.* Any recovery obtained flows to those who would have received it had the decedent obtained a damages recovery immediately prior to death. *Id.* Thus, the heirs or legal representatives of a decedent's estate may recover for the physical pain, suffering, and property damage sustained by the decedent before death, as well as for medical expenses and other damages. *Martinez v. Angerstein,* 517 S.W.2d 811, 815–16 (Tex.Civ.App.—Corpus Christi 1974, writ dism'd w.o.j.).

■ A party may establish the existence of conscious pain and suffering by

circumstantial evidence. Pain and suffering may be inferred or presumed as a consequence of severe injuries. *City of Austin v. Selter*, 415 S.W.2d 489, 501 (Tex. Civ.App.—Austin 1967, writ ref. n.r.e.). In Texas, only pain consciously suffered and experienced is compensable. *Southern Pac. Transp. Co. v. Luna*, 730 S.W.2d 36, 38 (Tex.App.—Corpus Christi 1987, no writ).

The evidence at trial regarding the accident establishes that the ATV hit a post and Polito was thrown from the ATV and landed on the ground. The individual riding on a four-wheeler in the same vicinity as Polito, Francisco Llamas Escamilla, testified that Polito was not wearing a helmet.

Dr. Florentino Perez Charles, the doctor who performed the autopsy, testified that the cause of death was a "severe cranial trauma which produced fractures in the skull, cerebral lacerations, edema and cerebral hemorrhaging." Dr. Charles also found "several lesions which were compatible with excoriations and ecchymosis" [3] on the face, under the eyelids, front thorax, and legs. The doctor further testified that the fatal injury was the trauma received to the head. Dr. Charles testified that the injury rendered Polito unconscious immediately and when there is a severe injury of this kind the body has a "mechanism that blocks out pain;" one of the mechanisms is unconsciousness.

Escamilla testified that he and Polito were riding the ATVs and Polito was behind him, and when he realized that Polito was not following him, he went back and saw that the ATV was on top of a fence and Polito was on the ground and was "spewing blood through the mouth." Escamilla further testified that when he ar-

rived at Polito's location, Polito was unconscious and never regained consciousness.

Ed Martinez, an accident reconstructionist, when asked on cross-examination what the bruising on the anterior of Polito's thighs indicated that they came into contact with, testified:

They could have. I'm not—I'm saying if a medical person, I believe was what I said earlier, were to tell you that that bruising is as a direct consequence of interaction with the handlebars, I couldn't find fault with it because I have made the observation in the medicals. But I can't tell you whether that particular bruising, the way that it might be described in detail, would come from this or from some other source.

In their brief, the Ramoses rely on the bruising to Polito's thighs to show pain and suffering. There is no evidence the bruising occurred before the fatal impact or while Polito was conscious.

The Ramoses assert that since the only eyewitness to the accident, Salvado Ramos Valencia, felt fear and was scared as he watched Polito's accident, then "Hipolito felt the same fear and mental anguish before he suffered his horrific injuries." Valencia testified that he watched Polito riding the ATV and saw the ATV bounce along the road, but did not see Polito being thrown from the ATV and land on the ground because he was "scared because of the accident." Valencia said he was worried because "Hipolito is the son of a couple that I know." He felt fear because he is:

a person that has never had any problems, no fighting, no problems with the law. I'm a pacific person. I don't fight.

---

**3.** The doctor stated, "when I say excoriations and ecchymosis, I mean a bruise, a black and blue area."

That's why everything worries me and scares me.

While Valencia witnessed an unpleasant sight, the fact that he looked away is not indicative of pain and suffering. Valencia's testimony is also not evidence of Polito being conscious.

After reviewing the evidence, we hold the trial court did not err in granting the directed verdict on the Ramoses' survival claim. Appellants' seventh point of error is overruled.

### I. JURY QUESTIONS

 In their eighth point of error, the Ramoses contend the trial court erred by failing to submit jury questions regarding gross negligence, malice, and exemplary damages as to Honda. The Ramoses argue: "The trial court also erred in granting a directed verdict and/or not submitting issues regarding gross negligence and/or malice and exemplary damages because of the survival claim." Exemplary damages are recoverable based on a survival cause of action. *See Houston–Am. Life Ins. Co. v. Tate,* 358 S.W.2d 645 (Tex. Civ.App.—Waco 1962, no writ.).

 Only issues raised by the evidence are to be submitted to the jury. TEX.R.CIV.P. 278. Whether a question is raised by the evidence is to be determined by the same standard that applies to determination of whether an instructed verdict should be given. *Blonstein v. Blonstein,* 831 S.W.2d 468, 471 (Tex.App.— Houston [14th Dist.] ), *writ denied per curiam,* 848 S.W.2d 82 (Tex.1992). The reviewing court must view the evidence and inferences in the light most favorable to the party with the burden of securing the finding, disregarding all evidence and

inferences to the contrary. *Murphy v. Seabarge, Ltd.,* 868 S.W.2d 929, 933 (Tex. App.—Houston [14th Dist.] 1994, writ denied). If there is any evidence of probative value to support the question, the trial court may not refuse to submit the issue to the jury. *K–Mart Corp. v. Pearson,* 818 S.W.2d 410, 413 (Tex.App.—Houston [1st Dist.] 1991, no writ). We review all of the Ramoses' complaints about the sufficiency of the evidence to support submission of jury questions in light of this standard.

Since we have already determined that a directed verdict on the survival claim was proper, we also conclude that any jury questions regarding the survival action were also properly excluded. *See* TEX. R.CIV.P. 278.[4] Appellants' eighth point of error is overruled.

### J. CUMULATIVE ERRORS

In their ninth point of error, the Ramoses contend the cumulative errors committed by the trial court were reasonably calculated to cause and probably did cause the rendition of an improper judgment requiring reversal and a new trial.

In this point of error, appellants simply restate their eight prior points of error. We have already addressed each point of error and will not address them again. *See* TEX.R.APP.P. 47.1. Appellants' ninth point of error is overruled.

### K. CHOICE OF LAW

 In a single cross-point, Honda contends the trial court erred in denying its motion to apply the law of Mexico to the Ramoses' claims. Accompanying the motion was a copy of the relevant Mexican laws in Spanish and an affidavit from an attorney who practices in Mexico translat-

---

**4.** The Ramoses' argument also fails because it has been inadequately briefed. *See* TEX. R.APP.P. 38.1.

ing the statutes into English and interpreting their applicability.

■■■■ The issue of which law applies to a case is generally a question of law resolved by a *de novo* review of the record. *Minnesota Mining & Mfg. Co. v. Nishika Ltd.*, 955 S.W.2d 853, 856 (Tex.1996). In Texas, the "most significant relationship test" governs all conflicts of law cases sounding in tort. *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex.1979). In wrongful death actions, the legislature has admonished the courts to apply the rules of substantive law "that are appropriate under the facts of the case." TEX.CIV.PRAC. & REM.CODE ANN § 71.031(c) (Vernon 1997). The supreme court has interpreted § 71.031(c) to incorporate the most significant relationship test. *Total Oilfield Serv. Inc. v. Garcia*, 711 S.W.2d 237, 239 (Tex. 1986).

The significant relationship test is set forth in sections 6 and 145 of the Restatement (Second) of Conflicts. *Gutierrez*, 583 S.W.2d at 318. The choice of law principles, set out in section 6, are:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Id.* When applying the above principles in a tort case, the following factors from section 145 must be considered:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

*Id.* at 319.

■■■■ Application of the most significant relationship test does not turn on the number of contacts in section 145, but rather on the qualitative nature of those contacts as affected by the policy factors found in section 6. *Id.* The court must determine the relationship between the contacts and the policy factors on a case by case basis. *Id.*

### 1. *Applying Section 145*

At the outset, we apply the factual matters stated under section 145(2). The evidence showed that Polito died in Matamoros, Mexico. The alleged wrongful conduct of Honda that caused the death

occurred in Japan, where the ATV was designed and manufactured, and in Texas, where the ATV was first placed in the stream of commerce. The alleged negligent conduct of the Ramoses occurred in Mexico. Polito and his family are domiciled in or residents of Mexico. Honda Motor Co., Ltd. and Honda R & D Co., Ltd. are Japanese corporations and their principal place of business is in Japan. Honda R & D North America, Inc., Honda North America, Inc., and American Honda Motor Co., Inc. are California corporations with their principal places of business in that state. If any relationship exists between the Ramoses and Honda, it is centered in Mexico, where Mr. Ramos purchased and operated the used ATV. BSC has its place of incorporation and principal place of business in Texas. James's domicile or residence is Texas. Because of the Ramoses' allegations against BSC and James, a relationship between those parties was centered in Texas. With the exception of stream of commerce, the contacts concerning BSC and James became irrelevant when the case against them was struck.

From the above contacts, clearly there is a significant relationship with two countries and two states—Mexico, Japan, Texas, and California. However, only the laws of Mexico and Texas are at issue. We must, thus, consider the policy factors set forth in section 6 of the Restatement as they relate to contacts with Mexico and Texas.

### 2. *Applying the Contacts to Section 6 Policy Factors*

■ We must analyze section 145 factual contacts in light of their impact upon the policy factors set out in section 6 of the Restatement. *Gutierrez,* 583 S.W.2d at 319. Comment e to section 6 pronounces that "if the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 6 cmt. (1971). This comment speaks to considerations (b) and (e), the relevant policies of the forum and the basic policies underlying the particular field of law. Texas courts have emphasized these two factors in determining which forum has the "most significant relationship" to the claim at issue. *See, e.g., Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984); *Vizcarra v. Roldan,* 925 S.W.2d 89, 91 (Tex.App.—El Paso 1996, no writ).

### a. The Needs of the Interstate and International Systems

Texas and Mexico want commerce between the two places, especially along the border. The fact that a defective product entered the stream of commerce in Texas and eventually ended up in Mexico does have an impact on the commerce between Texas and Mexico. Although Mr. Ramos did not buy the ATV from a Texas dealership, nor could he have, as that particular ATV is no longer distributed in the United States, and the ATV was purchased secondhand from a friend in Mexico, the ATV was initially sold to a consumer in Texas. Although the exact chain of ownership is undetermined, the ATV was eventually sold in Texas to someone in Mexico or someone who would be taking the ATV into Mexico, and Texas and Mexico need their citizens to be protected and treated fairly when visiting or conducting business abroad. This policy factor, therefore, has important significance in determining which law to apply.

### b. Relevant Policies of Texas as the Forum State

■ By adopting strict products liability laws, Texas has expressed a clear

interest in protecting its consumers and in regulating the quality of products in its stream of commerce. Texas has a strong policy interest in controlling corporate action in areas such as the manufacture of defective products. *See Ford Motor Co. v. Aguiniga,* 9 S.W.3d 252, 260–61 (Tex. App.—San Antonio 1999, pet. denied) (citing *Vizcarra,* 925 S.W.2d at 91.). Simply, Texas maintains an interest "in protecting its citizens from, and compensating them for, injuries resulting from defective products." *Aguiniga,* 9 S.W.3d at 261. Although the ATV eventually ended up in Mexico, the key factor is that the ATV was originally placed in the stream of commerce in Texas, and Texas has a strong interest in regulating the conduct of corporations that have business operations in the state. *See Dow Chemical Co. v. Alfaro,* 786 S.W.2d 674 (Tex.1990). "The expansive Texas system of tort liability for defective products serves as an incentive to encourage safer design and to induce corporations to control more carefully their manufacturing processes." *Mitchell v. Lone Star Ammunition, Inc.,* 913 F.2d 242, 250 (5th Cir.1990). Thus, this Texas interest would be furthered by the application of Texas law.

### c. Relevant Policies and Interests of Mexico

The attorney's affidavit attached to Honda's motion to apply the laws of Mexico reflects that although Mexico has not adopted strict products liability for defective products, injured persons may recover if they can prove the manufacturer's negligence. In wrongful death cases, Mexican law balances the need to provide relief to its citizens with the country's need to stimulate commerce by limiting the plaintiff's recovery. Under Mexican law, a plaintiff in a case such as this can recover compensation for 3000 days of salary, four months of salary for funeral expenses, and any medical expenses incurred before death. Inexcusable negligence may bar a plaintiff's recovery, and relevant Mexican law has been interpreted to provide for comparative responsibility.

While Mexico has a great interest in seeing its citizens, the Ramoses, compensated for the loss of their son by defendants who continue to market the particular ATV at issue within the country, this particular instance involves the competing interest of Texas, where this particular ATV entered the stream of commerce. While we do not deny that Mexico has an interest in regulating the use of ATVs within its boundaries, the forum that introduced this particular ATV in the stream of commerce, Texas, maintains an appreciable interest in applying its law to this case. This factor, therefore, weighs in favor of applying Texas law.

### d. The Remaining Factors

There are no justified expectations for which law applies. Honda could expect to be subject to the laws of any jurisdiction in which an accident occurs involving its products or where it does business. The Ramoses were not aware until after the accident that the ATV was originally placed in the stream of commerce in Texas. As for the various policies underlying negligence and products liability law, they were discussed above.

The Ramoses argue that Texas courts will find it easier to determine and apply its own strict products liability laws. They also argue that applying Texas law would provide certainty, predictability, and uniformity in the result. However, the issue is not which law is easier to apply, but whether Mexican law can be determined and applied with ease. After reading the translations of the relevant laws, we conclude the trial court and the attorneys can

employ the Mexican laws with ease. Mexican law may differ from Texas law, but nothing in the record indicates it is more complicated to apply. Nor does the difference mean the parties will be confronted with results under the Mexican negligence laws that are uncertain, unpredictable, or that will not be uniform. We conclude the factors discussed in this section are of little consequence in our determination of which laws to apply.

After considering the contacts in relation to the policy factors, we hold the trial court did not err in refusing to conduct the trial under the laws of Mexico. We overrule appellees' sole cross-point.

## L. Conclusion

We affirm the trial court's order striking appellants' claims against Brownsville Sports Center, Inc. and Leon James. We affirm the trial court's take-nothing judgment against the representatives of the Estate of Hermes Hipolito Ramos Sanchez, Deceased.

We reverse the trial court's take-nothing judgment against Hipolito Ramos Sanchez, Individually, and Alma Laura Galvan de Ramos, Individually. We render judgment that Hipolito Ramos Sanchez, Individually, have a judgment against Honda Motor Co., Ltd., Honda R & D Co., Ltd., Honda R & D North America, Inc., Honda North America, Inc., and American Honda Motor Co., Inc., jointly and severally, in the amount of $7,500,000.00, together with post-judgment interest thereon at the legal rate. We also render judgment that Alma Laura Galvan de Ramos, Individually, have a judgment against Honda Motor Co., Ltd., Honda R & D Co., Ltd., Honda R & D North America, Inc., Honda North America, Inc., and American Honda Motor Co., Inc., jointly and severally, in the amount of $7,500,000.00, together with

post-judgment interest thereon at the legal rate.

## OPINION ON MOTIONS FOR REHEARING

Appellees, Honda Motor Co., Ltd., Honda R&D Co., Ltd., Honda R&D North America, Inc., Honda North America, Inc., and American Honda Motor Co., Inc., have filed a motion for rehearing. We overrule appellees' motion for rehearing.

Appellants, Hipolito Ramos Sanchez and Alma Laura Galvan de Ramos, both individually and on behalf of the Estate of Hermes Hipolito Ramos Galvan, Deceased, have also filed a motion for rehearing, in which they raise twelve points of error. Appellees have filed a response to appellants' motion for rehearing.

██ In their first point of error, appellants contend this Court erred in failing to include prejudgment interest in the judgments we rendered in our original opinion.

The record reflects that appellants requested prejudgment interest in their trial pleadings and in the brief they filed with this Court. Under the finance code in effect at the time of these judgments and its predecessor statute, prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives a written notice of a claim or (2) the date suit is filed. TEX. FIN. CODE ANN. § 304.104 (Vernon Supp. 2001) (prior version, Act of June 3, 1987, 70th Leg., 1st C.S., ch. 3, § 1, 1987 Tex. Gen. Laws 51); *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998). Prejudgment interest accrues as simple interest at the rate of ten percent per annum. TEX. FIN. CODE ANN. §§ 304.103, 304.104 (Vernon Supp. 2001) (prior version, Act of June 3, 1987, 70th Leg., 1st C.S. ch. 3, § 1, 1987 Tex. Gen. Laws 51); *Johnson & Higgins*, 962 S.W.2d at 531. Prejudgment interest accrues un-

til the day preceding the date judgment is rendered. TEX. FIN. CODEANN. § 304.104 (Vernon Supp. 2001) (prior version, Act of June 3, 1987, 70th Leg., 1st C.S., ch. 3, § 1, 1987 Tex. Gen. Laws 51).

The record establishes that Hermes Hipolito Ramos Galvan was fatally injured on February 19, 1995, when he lost control of a Honda three-wheel all-terrain vehicle, and that appellants filed suit against appellees on May 30, 1995. We conclude that prejudgment interest in this case runs from May 30, 1995 until February 7, 2001, the day preceding the date of judgment, at the rate of ten percent per annum. We find no evidence in the record that prejudgment interest was tolled during this time period. We sustain the first point of error of appellants' motion for rehearing.

We grant appellants' motion for rehearing as to point of error number one. The remaining points of error of appellants' motion for rehearing are overruled. We modify the judgments we rendered in our original opinion to include prejudgment interest at the rate of ten percent per annum from May 30, 1995 until February 7, 2001.