ACCEPTED
13-13-00296-CV
THIRTEENTH COURT OF APPEAL
CORPUS CHRISTI, TEXAS
2/10/2015 4:37:35 PM
DORIAN RAMIREZ
CLERK

## NO. 13-13-00296-CV

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
2/10/2015 4:37:35 PM
DORIAN E. RAMIREZ
Clerk

IN THE THIRTEENTH COURT OF APPEALS
AT EDINBURG, TEXAS

## MERCEDES-BENZ USA, LLC, JACK L. HOLT, CRAIG W. DEARING, and FRANK J. OSWALD, JR., *Appellants*,

## v.

## CARDUCO, INC. d/b/a CARDENAS METROPLEX *Appellee.*

On Appeal from the
445th Judicial District Court, Cameron County, Texas

## POST-ARGUMENT SUBMISSION

TO THE HONORABLE THIRTEENTH COURT OF APPEALS:

This case was argued on November 24, 2014 before Chief Justice Valdez and Justices Rodriguez and Longoria.[1]  To more fully address specific questions the Court asked and to call the Court's attention to additional authority published after briefing closed, Appellee Carduco respectfully tenders this post-submission brief.

---

[1] The case was abated from September 30, 2014 until December 17, 2014 to allow for mediation.

## I.    *MAN Engines* **applies.**

Mercedes asserts it should prevail because one of the many dealership documents executed by the parties contains a boilerplate merger clause. But Mercedes waived this disclaimer of reliance argument. Appellee's Br. at 25-26. As Carduco explained in its letter brief of September 23, 2014, after briefing in this case closed, the Texas Supreme Court confirmed that contractual disclaimer defenses must be pleaded affirmatively. *See MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 135-36 (Tex. 2014) ("Disclaimer is an affirmative defense subject to Rule 94's requirements.").

Mercedes never pled express disclaimer as an affirmative defense, nor was it tried by consent. Mercedes first mentioned disclaimer during the charge conference. Even then, Mercedes' objection was not that fraud or negligent misrepresentation questions were inappropriate because justifiable reliance was negated as a matter of law. Mercedes first expressed that argument after the trial in its Motion for JNOV and amended motion for new trial. That was too late. *MAN Engines*, 434 S.W.3d at 136 (holding that express-disclaimer argument first raised in Motion for JNOV and

Entry of Take-Nothing Judgment was waived because Tex. R. Civ. P. 94 requires that affirmative defenses be raised before trial).[2]

At oral argument, however, Mercedes urged that contractual disclaimer of reliance is distinguishable from contractual disclaimer in general and is not an affirmative defense. Mercedes maintains that disclaimer of reliance "negates" the element of a fraudulent inducement claim and, therefore, is unlike a typical affirmative defense. That argument fails for several reasons.

First, that is precisely the argument that the losing party made to the Texas Supreme Court in *MAN Engines*: "MAN asserts that its express disclaimer of implied warranties *negated* Shows's implied-warranty claim." 434 S.W.3d at 136 (emphasis added). The Court's holding nonetheless requires express disclaimer to be properly pleaded and was not limited to only contractual disclaimers of implied warranty or to any other subset of contractual disclaimers. Thus, where disclaimer of implied warranty is properly pleaded and proven, it *negates* the existence of an implied warranty even if the plaintiff proves all the elements of implied warranty. That is exactly what an affirmative defense is. A disclaimer of reliance is no different because it negates justifiable reliance that a plaintiff has otherwise proved.

---

[2] *See also Samedan Oil Corp. v. Intrastate Gas Gathering*, 78 S.W.3d 425, 453 (Tex. App.—Tyler 2001, pet. granted, judgm't vacated w.r.m.) (disclaimer of reliance, an affirmative defense, was first raised in Motion for JNOV and therefore waived).

And under the Court's analysis in *MAN Engines*, there is no distinction between disclaimer of implied warranty and disclaimer of reliance. It was Carduco's burden to prove the elements of its fraud claim, including justifiable reliance. To attempt to avoid Carduco's fraud claim through an exculpatory contract provision, Mercedes needed both to plead that defense and to carry *its* burden of proof by establishing (1) that the clause is a valid disclaimer of reliance under *Italian Cowboy* as a matter of law; and (2) taking into account all facts and circumstances surrounding the formation of the contract containing the disclaimer, that the balance of the *Forest Oil* factors weighed in Mercedes' favor.[3]  Brief of Appellee at 30-31.

As an affirmative defense, the burden would rightfully be on Mercedes to prove both a legally valid disclaimer and the predominance of the *Forest Oil* factors. If disclaimer of reliance were not an affirmative defense, a plaintiff would effectively have to prove all the elements of fraudulent inducement, then prove that no valid disclaimer of reliance existed in the contract under *Italian Cowboy*, and further

---

[3] The *Forest Oil* factors *themselves* demonstrate that a defendant seeking to avoid antecedent fraud must establish certain facts relating to the formation of the contract containing the disclaimer: "(1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear." *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 (Tex. 2008). Each of these factors is phrased in the affirmative—requiring the defending party to establish some or all of them in order to avoid antecedent fraud even *if* a legally valid disclaimer of reliance is present.

4

prove, in the event there is a valid disclaimer, that none of the *Forest Oil* factors existed at the time of the contract. That is not the plaintiff's burden.

Moreover, as the Texas Supreme Court explained, and as Justice Longoria recognized, Oral Arg. 9-24-14 at 12:44, the issue is notice. Rule 94's purpose "is to give the opposing party notice of the defensive issue to be tried." *MAN*, 434 S.W.3d at 136. This rule of fairness requires the defendant to identify affirmative defenses involving facts distinct from elements of the plaintiff's claim, so that the plaintiff may reasonably prepare to rebut or explain them. *Id.* at 136.

Carduco proved its reliance element. It is uncontroverted that Mr. Cardenas would not have purchased the dealership had Mercedes not misrepresented the McAllen opportunity or had it fully disclosed that a competing dealer had already been chosen for McAllen. To effectively show that reliance was not justified, a disclaimer of reliance must satisfy the *Italian Cowboy* requirements and *Forest Oil* factors, which involves evidence and facts distinct from plaintiff's claim. Because Mercedes did not timely identify its disclaimer defense, Carduco had no notice and therefore no opportunity or reason to fully develop the record on these elements. As Carduco has demonstrated, even on the limited record, those factors weigh against enforcing the disclaimer. Appellee's Br. at 26-31.

**II.     There is no conflict between Mercedes' misrepresentations and the parties' contracts.**

The Court was interested in the application of *Playboy Enterprises* to the facts and evidence in this case. To further aid the Court, we offer new authority from the Texas Supreme Court, as well as additional direction to the record and the statutory overlay that Mercedes sought to brush aside during oral argument.

The jury found that Mercedes and its managers defrauded Carduco into the "Dealership Acquisition," which included the Asset Purchase Agreement between Autoplex Harlingen and Carduco and multiple dealer agreements between Carduco and Mercedes.  Br. Appellee at 17; CR355-56.  To sustain its argument under *Playboy*, Mercedes attempts to show that misrepresentations alleged by Carduco directly contradict an express, unambiguous contract provision.  But the misrepresentations alleged and proven at trial do not conflict with the standard form provisions Mercedes cites.

First, there is no obvious conflict between any of Mercedes' multiple misrepresentations and the form provisions.  Second, Mercedes' new interpretation of those provisions urged in its reply brief and oral argument—*i.e.* that Mercedes had unfettered discretion to withhold consent to any relocation regardless of the site—conflicts with the Texas Occupations Code and, even if correct, would be invalid.    Third,   there   is   no   contradiction   between   Mercedes'   multiple

misrepresentations intended to conceal the new dealership being installed in McAllen and any contract provision.

### A. The plain language of the "relocation" provision does not obviously contradict any of Mercedes' false representations.

Mercedes has reduced Carduco's entire fraud case to a single sentence from Carduco's pre-trial pleading, alleging a promised right to relocate to McAllen.[4] Having mischaracterized Carduco's allegations as a single, affirmative misrepresentation, Mercedes attempts to create a contradiction by cobbling together multiple clauses from two separate documents that pertain to a franchised dealer's standard agreement not to operate its dealership from an unauthorized location or to move to another site without Mercedes' prior approval. Br. Appellant at 10 (citing DX26; DX27).

Mercedes contends that, even if it intentionally misled Carduco that it would relocate to McAllen upon finding a suitable site while continuing to operate in Harlingen "in the interim," that misrepresentation is negated as a matter of law by the relocation clause in the Standard Provisions form. Based on that alleged right,

---

[4] Carduco's live pleading was twenty pages long and described, in detail, the "affirmative misrepresentations, intentional omissions, half-truths, active concealment of the truth, and fraudulent conduct" committed by Mercedes—pointing out that Mercedes "intentionally waited until after Carduco had acquired Autoplex Harlingen's assets for $7 million to inform Carduco that Heller-Bird would become the only Mercedes-Benz dealer in the McAllen sales area." CR 328, 329-30.

Mercedes believes that Carduco could not have justifiably relied on any of the voluminous pre-contract misrepresentations regarding McAllen. Under Mercedes' interpretation of that clause, "prior written consent" meant that Mercedes could refuse to consent to Carduco's relocation to McAllen at all and for any reason—even if Carduco secured a suitable McAllen site. Mercedes took that position at oral argument, equating the terms of the license agreement in *Playboy* with the relocation provision. Oral Arg. at 7:44-8:20. Mercedes' argument is wrong. And recent authority from the Texas Supreme Court makes clear the question is one of obviousness to the defrauded party, which is absent here.

The legal principle underpinning *DRC Parts & Accessories, L.L.C v. VM Motori, S.PA.*, 121 S.W.3d 854, 858 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)—which this Court applied in *Playboy*—derives from the Texas Supreme Court's opinion in *Thigpen v. Locke*, 363 S.W.2d 247 (1962). In *Thigpen*, the Court addressed fraud in the context of a party's failure to read and understand the contract he signed. 363 S.W.2d at 251 ("In an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests and is charged with knowledge of all facts which would have been discovered by a reasonably prudent person similarly situated.").

The Houston Court of Appeals applied the *Thigpen* principle in *DRC Parts* to reject justifiable reliance as a matter of law where the oral representation was

8

"directly contradicted by the express, unambiguous terms of a written agreement between the parties." 121 S.W.3d at 858. The principle is simple: a party that exercises ordinary care to read a contract it signs would know the prior representations were false when the promises are directly and obviously contradicted by the contract's terms.

The Texas Supreme Court recently reiterated the *Thigpen* principle in *National Property Holdings, L.P. v. Westergren*, No. 13-0801, 2015 WL 123099 at *4 (Tex. Jan. 9, 2015). The Court held that Westergren was not justified in relying on misrepresentations regarding the terms of a settlement that directly contradicted a full release where Westergren had chosen not to read the release before signing it. *Id.* As the Court explained, "[i]t is well-established that '[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its *falsity is obvious to him*.'" *Id.* (quoting Restatement (Second) of Torts § 541 (1977) (emphasis added)). Thus, the Court concluded, a party cannot justifiably rely on "oral representations regarding the contract's unambiguous terms." *Id.* (citing *Thigpen*, 363 S.W.2d at 251).

Because Mercedes took active steps to mislead Mr. Cardenas about relocating to McAllen—and the deception was aimed at concealing the Heller-Bird deal

itself—Mercedes cannot claim that the "relocation clause" directly and obviously contradicted Mercedes' misrepresentations.[5]

The relocation provision does not unambiguously say what Mercedes now claims. The only interpretation consistent with Texas law, and with the parties' actions here, is that the clause related to approval of a specific site, not to Mercedes' ability to deny any relocation whatsoever. And unless the clause unambiguously states a direct contradiction, it does not under *Thigpen, DRC Parts,* or *Playboy* negate Carduco's justifiable reliance. Here, Mercedes misrepresented that Carduco would be able to proceed upon locating a suitable site in McAllen. Mercedes' executives conceded that its role in approving a relocation is limited to approving the specific site selected and the proposed dealership facility. 9RR26-27, 121, 10RR8. Mercedes suggestion now that it could deny any relocation—as opposed to approving a specific site—contradicts its own witnesses' testimony at trial. Indeed, as discussed further below, accepting Mercedes' reading would also put the clause in conflict with the Texas Occupations Code.

That the clause pertains only to Mercedes' involvement in approving a proposed site is consistent with both parties' actions. Mercedes encouraged Mr.

---

[5] Indeed, the supposed "contradiction" that Mercedes depends on was not even obvious to Mercedes throughout the course of the litigation below. Mercedes never moved for summary judgment or directed verdict with respect to any "relocation" provision and only argued that clause obliquely for the first time during the formal charge conference. 14RR91.

Cardenas to submit architectural and site plans for the new location in McAllen and for Harlingen in the interim.[6] And Carduco worked to obtain Mercedes' site approval for the relocation, including taking Mercedes personnel on a tour of two sites near McAllen for Carduco's proposed relocation. The Mercedes employees specifically stated that both sites "looked good" and that Carduco should submit the sites to Jack Holt for approval—despite the fact that Mercedes' already-consummated binding agreement with Heller-Bird meant that Mercedes would never approve Carduco for any site in McAllen.

A clause presenting a direct contradiction to Mercedes' misrepresentation might have been "dealer will not be permitted to relocate to McAllen" or "if dealer desires to relocate, the parties may engage in negotiations regarding the relocation." No such clause is present. Moreover, in *Playboy*, the plaintiff claimed a *promised* distributorship, but the contract provided that the parties would *negotiate* future expansions beyond Mexico. Even so, if Playboy had already secretly given the U.S. distributorship to another party at the time the license agreement was executed, that would also have been fraudulent. That type of misrepresentation, like the ones made here, would have falsely communicated that there was a *possibility* or even

---

[6] Of course, Mercedes did so days *after* it agreed for Heller-Bird to open a competing dealership in McAllen and acknowledged that it would never have approved any site plan Carduco submitted for that city. 9RR112-13.

11

likelihood of obtaining an expanded distribution agreement (in this case, a relocation) when, in fact, there was not.

As Carduco proved to the jury, the notion that Mercedes would deny Carduco's proposed relocation to McAllen—no matter what site Carduco submitted for approval—was not even conceivable when Carduco closed on the Dealership Acquisition, let alone obvious. Mercedes had long requested and encouraged the relocation and it continued to string Carduco along by soliciting site plans for McAllen and visiting sites there. At the time of the inducement, there was no other dealership in the Rio Grande Valley and the "optimal strategy" identified by Mercedes' own studies was to maintain only one dealership in the Valley by relocating the Harlingen dealership to McAllen. *See, e.g.,* PX1; 9RR15. The proposed move was within Carduco's own assigned market territory, or "Area of Influence," at the time it closed on its purchase and Mercedes acknowledged that it was standard to approve such a move. 9RR26. The only fact that had changed was Mercedes' decision to "work around" Carduco's purchase by installing Heller-Bird in McAllen, the very fact that Mercedes intentionally concealed. In sum, Carduco justifiably relied on Mercedes' misrepresentations because they were not directly and obviously contradicted by unambiguous contract provisions.

**B. Mercedes' interpretation of the relocation provision ignores the regulatory scheme governing dealer relocations in Texas.**

The new twist employed by Mercedes in its reply brief and argument—that Mercedes had sole unfettered discretion to deny Carduco's relocation for any reason—conflicts directly with the law and Mercedes' own trial testimony.[7] Mercedes urges this "unbridled discretion" argument to square its position with *Playboy*, where the license agreement expressly stated that the distributor could not distribute beyond Mexico and that Playboy could refuse to expand the license for any reason. *Playboy Enters. Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 258 (Tex. App.—Corpus Christi 2006, pet. denied).

But if Mercedes' new construction were correct, the "relocation" provision would not even apply in Texas. While the distribution of Playboy magazines is not regulated by the Texas legislature, the relationship between automobile distributors and their dealers certainly is. As Carduco explained in its briefing and argument, the Texas Occupations Code specifically governs dealer relocations. Br. Appellee at 4 and n.2; Oral Arg. at 22:52-23:09. Regardless of what a franchise agreement might say, a distributor cannot deny a dealer's relocation request in Texas unless it

---

[7] *See* Reply Br. Appellant at 3 ("Because the Dealer Agreement allowed MBUSA to grant or deny *any* future application to relocate, [the contract] likewise contradicts any alleged promise to approve future relocation requests.") (emphasis added); Oral Arg. At 6:40, 10:18.

gives proper notice of denial and, upon protest, proves it had reasonable grounds to deny the relocation:

> *Notwithstanding the terms of any franchise*, a manufacturer, distributor, or representative may not deny or withhold approval of a written application to relocate a franchise unless:
>
> (1)  The applicant receives written notice of the denial or withholding of the approval not later than the 60th day after the date the application is received; and
>
> (2)  If the applicant files a protest with the board, the board makes a determination of *reasonable grounds*.

Tex. Occ. Code § 2301.464 (emphasis added).

And the same Standard Provisions document that contains the relocation clause expressly provides that any provision contravening Texas law or regulation is subjugated by state authority.[8]  Thus, construing the contract as a whole, the relocation clause could never apply to give Mercedes unlimited discretion to deny Carduco's relocation.  Mercedes admitted at trial that the statutory overlay means it does not get "the last say" in Texas as to whether a dealer may relocate its dealership and that Texas law controls over its form agreement.  *See* 9RR145.

---

[8] *See* DX27 (Standard Provisions) at 38 ("If any provision herein contravenes the laws or regulations of any state or other jurisdiction wherein this agreement is to be performed, or denies access to the procedures, forums, or remedies provided for by such laws or regulations, such provision shall be modified to conform to such laws or regulations, and all other terms and provisions shall remain in force.").

14

Indeed, Mercedes expressly acknowledged another example of how the Standard Provisions and dealer agreements give way to the Occupations Code when there is a conflict. The Standard Provisions give Mercedes a contractual right of first refusal should a dealer decide to sell his dealership. But Section 2301.359 of the Texas Occupations Code strictly limits the power a manufacturer or distributor has over a dealership's decision to sell, requiring only that the prospective buyer be of good moral character and sound financial qualifications. Mercedes' Jack Holt recognized and lamented the fact that, despite the contractual language, Mercedes could not scuttle Carduco's purchase of the dealership.[9]

The Occupations Code applies whether or not a party is seeking administrative relief. Its provisions are instruments of public policy that give dealerships explicit protection over contractual provisions that the Legislature has deemed inappropriate in manufacturer/dealer transactions. The Code demonstrates why Mercedes pursued a transaction with Heller-Bird and concealed its binding agreement with that dealer—to ensure success in an administrative protest after Carduco finally learned the truth.[10] And the existence of protest rights under the Code—which Mr. Cardenas,

---

[9] *See* DX27 (Standard Provision giving Mercedes first right of refusal); 9RR44 (Holt agreeing that if there were such a right, that would have been his way of blocking Renato Cardenas from purchasing the dealership); PX27 (email in which, upon learning there was no manufacturer right of first refusal in Texas, Holt stated "There is no God.").

[10] After it finally found out about Heller-Bird, Carduco did bring an administrative claim, but—as Mercedes had planned—by that time Heller-Bird was established and the protest became futile.

a Texas car dealer for more than 40 years, was familiar with—factors into Carduco's justifiable reliance as a factual matter. It certainly would not be obvious to an experienced dealer that Mercedes' form provision purports to override the Occupations Code by giving Mercedes unbridled discretion over relocations.

The statutory overlay also answers Justice Rodriguez's question as to why time was so important. Mercedes' covert plan was to thwart Carduco's relocation by installing Heller-Bird in McAllen. Br. Appellee at 4-5. Mercedes concealed that plan in order to get Heller-Bird established *before* Carduco closed on its purchase and gave notice of intent to relocate. Absent Heller-Bird's establishment in McAllen, Mercedes would have no "reasonable grounds" to sustain a denial of relocation (particularly when Mercedes itself had consistently requested such relocation). 5RR66-67; 10RR132-33, 211-12; *see* Tex. Occ. Code § 2301.464.

When Mercedes finally told Carduco about Heller-Bird, Carduco gave its statutory notice of intent to relocate, which Mercedes denied. 10RR211. Mercedes then rushed to file Heller-Bird's "evidence of franchise" to secure Heller-Bird in McAllen and block Carduco's relocation there. PX99. When Carduco protested the

---

Carduco exhausted its administrative remedies before filing this suit. In fact, Mercedes' appellate counsel, which represented *Carduco* in evaluating its claims against Mercedes before this lawsuit, acknowledged that fact before concluding this was a fraud case and referring the matter to Carduco's trial counsel. *See* Notice of Ongoing Trial Proceedings (filed with this Court on November 21, 2013, attaching Motion to Disqualify Baker Botts LLP, later withdrawn).

denial in an administrative proceeding, Mercedes' "reasonable grounds" for sustaining the denial were (1) that the McAllen sales area could support only one dealership; and (2) Heller-Bird's establishment in San Juan. 9RR144-45; 10RR132-33, 211-12.

So Mercedes used the very circumstance it created and concealed (Heller-Bird in McAllen) to keep Carduco from relocating. To now say Carduco's reliance is contradicted by a contract provision that is constrained by Texas law, when Mercedes affirmatively concealed the orchestrated placement it ultimately used as "reasonable grounds" under that same law, would pervert the regulatory scheme and deny justice in this case.

## C. Mercedes' exclusivity-clause argument is a red herring.

Throughout this litigation, Mercedes has recast Carduco's allegations as claiming a contractual right to exclusivity in the McAllen area—thus forcing a contradiction with a contractual "no exclusivity" provision. 7RR206-07. But Carduco doesn't claim an oral promise of contractual exclusivity in McAllen and did not argue that at trial. Mr. Cardenas expressly acknowledged that Carduco's dealer agreements with Mercedes did *not* provide for territorial exclusivity as a contract right. 7RR181, 206. Rather, Carduco proved that, in the "but for" world, as part of its benefit-of-the-bargain damages, it would have operated as the only dealer in the McAllen area for the foreseeable future. Carduco's single-dealer point

17

was a factual component of damages. And it was proved by Mercedes' own admissions and Mercedes' demonstrated ability to keep Carduco out of McAllen once it installed Heller-Bird in San Juan.

Mercedes admitted that the McAllen sales area could only support one dealership and that, based on the "optimal strategy" it identified, Mercedes would not have put two dealers in McAllen. *See e.g.* PX1; 9RR15; 10RR136-37. Mercedes further admitted that it supported its denial of Carduco's relocation in the administrative protest because Heller-Bird was already established in McAllen and the market could support only one dealer. 10RR132-33, 211-12. Moreover, as the jury learned, statutory protest rights constrain a distributor's ability to add new dealers to an existing dealer's territory. Because the McAllen area could support only one dealership, Carduco would have relocated to McAllen and could then have prevented another dealership from entering that market. Tex. Occ. Code § 2301.454, 652; *see also* 11RR140-42 (Expert Dr. Manuel, explaining that state law and protest rights constrain what Mercedes can do regardless of what the franchise agreements say).[11]

---

[11] This *de facto* exclusivity is not, as Mercedes suggested in its reply brief and at oral argument, a new argument on appeal. To the contrary, Carduco explained this very point on summary judgment, during motions in limine, at trial, and at the JNOV hearing after trial. *See* 4RR49; 1RR36-37; 23RR25.

Even in its damages model—to which this "exclusivity" issue pertains—Carduco did not urge any contractual right to exclusivity in the McAllen area. Rather, in assigning a discount rate to its anticipated profits in McAllen, Carduco's expert reduced Carduco's lost profits calculation by accounting for the possibility of future competition entering the market; *i.e.*, that the market would grow in size in the future and Mercedes might *then* have had reasonable grounds to put another dealer in McAllen. 11RR278.

**D.    There is no conflict between Mercedes' misrepresentations regarding the competing dealership and any "express, unambiguous clause" regarding relocation *or* exclusivity.**

Regardless of Mercedes' misinterpretation of the "relocation" or "exclusivity" provisions, it cannot explain how its most harmful misrepresentations—affirmative lies, active concealment, and failure to disclose with respect to the Heller-Bird deal—conflict in any way with those provisions. As Carduco argued, this Court in *Playboy* expressly recognized that damages are recoverable for fraudulent concealment or intentional failure to disclose material information. Oral Arg. at 33:00, 33:53-34:20; *Playboy Enters.*, 202 S.W.3d at 260. The most damning evidence at trial involved Mercedes' deliberate concealment of its agreement to place a competing dealership in the McAllen area, a decidedly material fact. Br. Appellee at 7-8, 15.

Mercedes' witnesses acknowledged under oath—before attempting to recant—that Mercedes affirmatively lied when directly asked about a new dealer going into McAllen. Mercedes conceded that its statements were "false," "misleading," and "untrue." 9RR107-08, 133; 10RR116. Mercedes also admitted that the hidden Heller-Bird deal would have been material to Carduco's decision to purchase the Harlingen dealership—and that they decided to conceal the information anyway. 9RR116-18; PX38 (Jack Holt email instructing Oswald to lie to Carduco); PX44-45 (Neis instructing Holt not to tell Carduco about Heller-Bird even though the information could affect Carduco's decision to buy the Harlingen dealership).

It is undisputed that, had Mr. Cardenas learned of a competing dealer going in to McAllen—*regardless* of Mercedes' misleading Carduco into believing it could relocate to McAllen—Carduco would never have followed through with its $7 million purchase of the Harlingen store. As Mr. Cardenas testified:

> Q. If Mercedes-Benz had told you that they were putting another dealer in McAllen before you closed this agreement, would you have closed?
>
> A. No.
>
> Q. If Mercedes-Benz had told you before you closed on this agreement that they were putting another dealer in McAllen, would you have signed franchise agreements with Mercedes-Benz?
>
> A. No, sir.

7RR140; *see also* 7RR107. Neither the affirmative misrepresentations nor the intentional failure to disclose the Heller-Bird deal implicates the "relocation" or

20

"exclusivity" provisions at all. Mercedes has not and cannot explain how it escapes liability under *Playboy* for fraudulently concealing the Heller-Bird agreement.[12]

Mercedes argues here, as Playboy argued on appeal, that this Court is wrong to embrace failure to disclose as a recognized basis for fraud liability. But this Court rejected those arguments, and the Texas Supreme Court denied review. In fact, Playboy's petition for review and brief on the merits in the Supreme Court, attacking this Court's *Playboy* holding, are eerily similar to the arguments in Mercedes' briefs to this Court.[13] *See* Tex. Supreme Court No. 06-1015, Playboy Enters. Pet. for Review (Dec. 27, 2006) and Petitioner's Br. on the Merits (Oct. 29, 2007). The Court should reject these recycled complaints.

## III. The spoliation instruction was fully justified.

Carduco has demonstrated that the context, background, and procedural facts fully supported the spoliation instruction given by the trial court. Appellee's Br. at 43-48. At oral argument, Mercedes suggested that *Brookshire Brothers v. Aldridge*,

---

[12] Instead, Mercedes recasts Carduco's claims as if its sole complaint was that Mercedes failed to disclose that Carduco could not relocate to McAllen. App. Br. at 13. That mischaracterization again ignores Carduco's pleadings and the evidence presented at trial. Mercedes' active concealment and failure to disclose were not limited to the fact that Carduco would not be permitted to relocate to McAllen, but included the most pivotal fact: that *a competing dealer was being awarded the McAllen area.*

[13] *See* Tex. Supreme Court No. 06-1015, Playboy Enters. Pet. for Review (Dec. 27, 2006) and Petitioner's Br. on the Merits (Oct. 29, 2007) (available at http://www.searchtxcourts.gov/Caseaspx?cn=06-1015&coa=cossup).

438 S.W.3d 9 (Tex. 2014), a case decided post-briefing, mandates reversal on this ground. That is incorrect. Under both the Texas Supreme Court's jurisprudence in place at the time of trial and the Court's refined spoliation framework, the instruction to the jury was proper.

In commercial fraud cases, internal communications between and among key players are critical. Those communications show motive, plan, intent, knowledge of likely harm, failure to disclose, and concealment. It is also important to have the whole picture to illuminate a broad scheme, which in this case was calculated and involved the highest levels of Mercedes management from the outset.

This lawsuit was filed in 2011, less than two years after the August 2009 meeting where Mercedes first informed Carduco that it would not be allowed to move to McAllen and that another dealer was being put there. Carduco requested electronically stored information and documents from Mercedes from the outset of this case. It was not until April 2013, almost three years after Mercedes anticipated litigation with Carduco—and only after the trial court granted two motions to compel and also ordered that Mercedes search its computer servers—that Mercedes finally performed a valid exploration of its electronic information.

The emails of at least nine people who would have been privy to Mercedes' activities in this case were deleted, or otherwise not produced. *See* Appellee's Br. at 44-46, App. A. When it became apparent that Mercedes had lost or destroyed

22

pivotal email communications, Carduco noticed the deposition of a corporate representative on the topic of Mercedes' efforts to identify, preserve, and produce relevant evidence. Mercedes designated senior in-house counsel, Mark Kelly.

Kelly acknowledged that Mercedes anticipated litigation with Carduco as early as March 2008, but did nothing to preserve relevant electronic documents and emails. 12RR234-237; 13RR233-36; CR458. Kelly acknowledged that he would have expected specific key players to have relevant communications and claimed he did not know why emails were missing. Kelly assured Carduco (falsely, as it turns out) that he would investigate what happened to that information and report back.

Carduco followed up repeatedly with Mercedes through counsel, but never received the promised explanation or report. Three months before the initial trial setting in August 2012, Carduco's amended petition sought a spoliation instruction. Having still received no explanation at the time of trial, Carduco subpoenaed a Mercedes corporate representative to appear at the spoliation hearing. Mercedes' Fred Newcomb acknowledged that the corporate representative on document retention and destruction (pursuant to the subpoena) was Mark Kelly. 10RR118. But Kelly did not appear. In Kelly's absence, Mercedes' trial counsel acknowledged that there was no consistent policy for the destruction of files when an employee

leaves Mercedes.[14] 12RR245. The trial court gave a mild instruction in the form proposed by Mercedes. CR257, 354. Carduco has shown that these circumstances fully warranted the instruction. Appellee's Br. at 43-48.

The Texas Supreme Court's intervening decision in *Brookshire Brothers* is not to the contrary. Under the Court's refined framework, the trial court (outside the presence of the jury) should determine whether the party spoliated and, if spoliation occurred, fashion an appropriate remedy. *Brookshire Bros.*, 438 S.W.3d at 9. To conclude that a party spoliated, the court must find that (a) the spoliating party had a duty to reasonably preserve; and (b) the party intentionally or negligently breached that duty by failing to do so. *Id.* Intentional spoliation "includes the concept of 'willful blindness,' which encompasses the scenario in which a party does not directly destroy evidence known to be relevant and discoverable, but nonetheless 'allows for its destruction.'" *Id.* at 24.

The procedure that Judge Hinojosa conducted in deciding the spoliation matter satisfies this standard. Both parties briefed the issue. The trial court conducted a lengthy hearing, outside the presence of the jury, on Carduco's request for a spoliation instruction. Carduco presented extensive evidence and deposition

---

[14] Mercedes represented in its reply and at oral argument that the documents were deleted through the "ordinary course of business" or "passage of time," *see* Oral Arg.9-24-14 at 45:39, but there is no evidence of that. In its brief, Mercedes cited only to the entire spoliation hearing, but that actually established that the documents were *not* deleted through a consistent, systematic policy.

testimony of Mercedes' corporate representative, Mark Kelly, on the topic of evidence preservation and destruction. The trial court reviewed the parties' briefing and made the determination to issue a spoliation instruction in the form proposed by Mercedes.

At oral argument, Mercedes urged new points related to intention that it never raised in objecting to the spoliation instruction or in its initial briefing on appeal:[15] Mercedes argued that Carduco "didn't try to prove [that the spoliation] was intentional" but instead maintained before the trial court simply that Mercedes did not "take its [preservation] obligation seriously enough." Oral Arg. at 18:00-18:34. Mercedes further argued that Carduco "certainly didn't get a finding" that Mercedes' spoliation was intentional. *Id.* Neither point is availing.

Carduco's trial-court briefing on spoliation expressly argued that Mercedes' destruction of evidence was intentional. As Carduco urged, "due to MBUSA's intention[al] destruction of evidence," e-mails belonging to a key Mercedes executive—Bob Neis—were deleted or destroyed. CR372. Carduco walked the trial court through Mercedes' admitted anticipation of Carduco's claims *years* before it made any effort to even look for relevant evidence. Carduco showed Mark Kelly's

---

[15] Mercedes' only objections to the spoliation instruction during the formal charge conference were (1) that Carduco did not suffer any prejudice due to spoliation, and (2) that there was no evidence that Mercedes actually destroyed evidence as opposing to losing or failing to produce evidence. 14RR87-88.

flippant testimony that Mercedes did not believe it was necessary to take measures to preserve relevant evidence. 13RR235. Carduco pointed Judge Hinojosa to Mercedes' commitment, under oath, to investigate and explain why relevant evidence was destroyed (not only from departed Mercedes employees but from key players who were still employed by Mercedes at the time of discovery depositions). Carduco showed that Mercedes failed to explain the destroyed communications as promised and that, after being subpoenaed to testify on that topic before Judge Hinojosa at the spoliation hearing, Kelly failed to appear.

Carduco specifically argued to the trial court that Mercedes' refusal to comply with a subpoena and present a witness to explain why relevant evidence was deleted or destroyed entitled the trial court to presume that Mercedes' testimony as to the reason for the evidence destruction would have been unfavorable to Mercedes. Carduco concluded its briefing succinctly:

> MBUSA's **intentional** destruction of its electronic documents and emails has prejudiced Carduco because emails and documents from key MBUSA employees who were at the center of the decision to purposefully and intentionally conceal material information from Carduco have been deleted.

CR387 (emphasis added).

In sum, Carduco argued and proved that Mercedes either deliberately destroyed electronic data or, just as damning, was willfully blind in countenancing its destruction. Carduco argued intentional spoliation throughout the trial court

26

proceedings and the trial court based its instruction on that premise. Mercedes sought, and the trial court submitted, a milder spoliation instruction. Mercedes is not entitled to any presumption that its destruction was innocent where it willfully ignored the trial court's subpoena and refused to produce a witness or evidence providing *any* explanation for its failure to produce documents and communications relevant to this lawsuit.

Mercedes' argument that Carduco "didn't get a finding" that the spoliation was intentional is also meritless. Carduco argued and proved intentional spoliation as the basis for obtaining an instruction. After reviewing the parties' briefing and hearing extensive evidence and argument, the trial court ruled that an instruction was appropriate. Mercedes never requested that the trial court issue findings of fact and conclusions of law with respect to the spoliation ruling. As this Court has stated, where no findings of fact and conclusions of law were requested or made part of the record below, the appellate court "must presume, unless the evidence fails to support the imposition of sanctions, that the trial court's decision was proper." *Sanchez v. Brownsville Sports Ctr., Inc. et al.*, 51 S.W.3d 643, 658 (Tex. App.—Corpus Christi 2001, pet. granted, judgm't vacated w.r.m.) (Hinojosa, J.); *see also Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992) (in nonjury trial, where no findings of fact or conclusions of law are filed or requested, "it will be implied that the trial court made all the necessary findings to support its judgment").

## IV.    No *Casteel* error occurred.

Carduco demonstrated that the judgment here rests on a single legal theory, common-law fraud, which the trial court submitted as this Court directed in *Formosa Plastics v. Kajima International*, 216 S.W.3d 436 (Tex. App.—Corpus Christi 2006, pet. denied) (en banc).  Appellee's Br. at 39-40.  Indeed, this case offers even less of a *Casteel* concern than in *Formosa Plastics*.  There, multiple contracts were at issue, involving multiple acts of reliance and causal chains.  Here, all of Mercedes' misrepresentations culminated in a single chain of reliance and causation.

Also, a case decided by the Texas Supreme Court after briefing in this case was completed shows that this is not, as Mercedes claims, a presumed-harm situation.  In *Ford Motor Co. v. Castillo*, the Supreme Court considered a jury question that, by virtue of a disjunctive "or" clause, permitted two alternate paths to proving a kind of fraud.  444 S.W.3d 616 (Tex. 2014).  Like Mercedes here, Ford argued that one path was unsupported by any evidence and thus it argued presumed harm.  The Court rejected the argument that this scenario presents a *Casteel* presumed-harm situation.

> Casteel issues do not arise in every situation where a jury has more than one legal theory to choose from when answering a single question. Instead, *Casteel* issues arise when one of the choices presented to the jury on a single, indiscernible question is legally invalid.  Castillo does not argue the legal invalidity of the element and thus *Casteel* does not apply.

*Id.* at 621.

Moreover, as this Court in *Formosa Plastic* held, any "labeling" issue is harmless under *Romero*. Mercedes quibbles over which labels (species of actions or omissions that can constitute misrepresentation) should apply to certain facts or evidence (which all prove one claim). But which labels apply is immaterial to liability here. All of them are aspects of the definitions of "misrepresentation." As in *Formosa Plastics*, the Court can be "reasonably certain that the jury was not significantly influenced." 216 S.W.3d at 455 (quoting *Romero v. KPH*, 166 S.W.3d 212, 227-28 (Tex. 2005)).

Justice Rodriguez recognized that Mercedes relies only on secondary authority for its argument to the contrary. And the two CLE papers Mercedes points to are old and do not address the last decade of development. One advocates an antiquated granular charge, which *Romero* and *Formosa Plastics* later showed unnecessary. *See* 29 Advoc. (Tex.) 29 (2004). The other is simply a case summary describing a petition for review that was denied. *See* 26 Advoc. (Tex.) 45, 52 (2004) (summarizing *Baribeau v. Gustafson*, 107 S.W.3d 52 (Tex. App.—San Antonio 2003, pet. denied)).

In any event, Mercedes did not preserve its *Casteel* argument. A clear and timely objection was needed to alert the trial court if Mercedes thought a fully granulated charge was required. But Mercedes suggested only that a separate blank might be needed for non-disclosure. It did not make any similar suggestion for other

examples of conduct that might constitute misrepresentation, but simply said there was no evidence of them. Mercedes' vanilla no-evidence objections, presented as part of a litany of similar objections, did not in practical terms tell the trial court how to fix the complaint and would not, if granted, have led to the addition of the extra twenty-four lines they now say are needed. The trial court was not required to guess that Mercedes' objection about the definition of misrepresentation actually hid a *Casteel* argument.

Finally, Mercedes' "28 questions" in the fraud context is unworkable and contrary to the law. The different facets of misrepresentation are not exclusive or distinct. Statements (or omissions) can fit into multiple boxes. If Mercedes' rule were followed, litigants and courts would not only depend on the jury's evaluation of credibility and competing testimony, but also demand that jurors correctly classify evidence into each discrete legal box.

## V.   The Court should not unduly reduce punitive damages.

Chief Justice Valdez briefly inquired about damages, but time constraints precluded exploration of this issue during argument. Carduco has demonstrated that punitive damages were more than warranted on this record and that Mercedes' proposed 1:1 ratio cap is contrary to law. Appellee's Br. at 55-69.

The Texas Supreme Court has recognized there is no absolute limit on punitive awards. It has, however, acknowledged a 4:1 benchmark in certain

economic injury cases such as this one.  *See Bennett v. Reynolds*, 315 S.W.3d 867 (Tex. 2010); *Tony Gullo Motors, I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006).  A 4:1 or 3:1 ratio also falls in line with historical analogues noted approvingly by the United States Supreme Court for "double, treble, or quadruple damages to deter and punish".  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003); *see also Bennett*, 315 S.W.3d at 877 n.47 (citing this principle).

There is also new authority since briefing closed.  The Austin Court of Appeals has issued a new decision in the *Bennett* series of cases, applying the Texas Supreme Court's guidance to uphold a 3:1 exemplary award.  *Bennett v. Grant*,--- S.W.3d---, 2014 WL 4058862 (Tex. App.—Austin, Aug. 13, 2014, no pet.) (*Bennett III*).  The *Bennett III* court dealt with misconduct found violative of the same cap-buster provision implicated here (tortious conduct equivalent to an enumerated felony under the Texas Penal Code).  The underlying tort in *Bennett III* was malicious prosecution.

The jury found actual damages of $10,703 and awarded exemplary damages of $1 million against each defendant.  *Id.* at *39.  The court of appeals recognized that the tort of malicious prosecution threatens but does not actually inflict imprisonment.  The court thus anchored its ratio analysis against "actual or potential damages," counting both the $10,703 in harm Bennett actually inflicted (attorneys

31

fees and mental anguish) and the $160,000 the court ascribed to the harm Bennett *intended* to inflict by a wrongful prosecution.

In suggesting remittitur, the court of appeals declined to use a 4:1 ratio, in part, because it "recognize[d] that [Bennett's] conduct did not actually cause" that level of injury. *Id.* at *74. The court instead chose a 3:1 ratio for conduct it found "abhorrent," while leaving ample room for "cases with more egregious injuries." *Id.* at *75.

Unlike the defendants in *Bennett III*, Mercedes fully succeeded in its plot to harm Carduco. And the actual injuries it inflicted were, in economic terms, far more egregious than those in *Bennett III*. *See* Appellee's Br. at 66-70. Also of importance, the *Bennett III* court applied the 3:1 ratio per defendant, not in the aggregate. *Id.* at *23-24. Here, the ratio between actual and punitive damages awarded is less than 1:1 for each of the three individual defendants.

## CONCLUSION

The judgment should be affirmed. Any suggestion of remittitur should comport with guidelines established by the U.S. and Texas Supreme Courts.

Respectfully submitted,


/s/ Wallace B. Jefferson
Wallace B. Jefferson
State Bar No. 00000019
wjefferson@adjtlaw.com
Susan S. Vance
State Bar No. 24036562
svance@adjtlaw.com
ALEXANDER DUBOSE
JEFFERSON & TOWNSEND LLP
515 Congress Ave., Suite 2350
Austin, Texas  78701
Telephone:  (512) 482-9300
Telecopier:  (512) 482-9303

Don Cruse
LAW OFFICE OF DON CRUSE
State Bar No. 24040744
1108 Lavaca St., #110-436
Austin, Texas 78701
Telephone: (512) 853-9100
Telecopier: (512) 870-9002
don.cruse@texasappellate.com

Peter D. Marketos
State Bar No. 24013101
pete.marketos@rgmfirm.com
Leslie Chaggaris
State Bar No. 24056742
leslie.chaggaris@rgmfirm.com
Reese Gordon Marketos llp
750 North S. Paul Street
Dallas, Texas 75201
Telephone: (214) 382-9810
Telecopier: (214) 501-0731

COUNSEL FOR APPELLEE
CARDUCO, INC. d/b/a CARDENAS
METROPLEX

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system of the Court. I also certify that a true and correct copy of the foregoing was served by e-service on the following counsel of record on February 10, 2015:

Thomas R. Phillips
State Bar No. 00000102
tom.phillips@bakerbotts.com
BAKER BOTTS L.L.P.
98 San Jacinto Blvd., Suite 1500
Austin, Texas 78701

Joseph R. Knight
State Bar No. 11601275
jknight@knighttxlaw.com
Law Office of Joseph R. Knight
111 Congress Ave., Suite 2800
Austin, Texas 78701

Matthew J. Kemner
State Bar No. 11254900
mkemner@cbmlaw.com
CARROLL, BURDICK & MCDONOUGH, LLP
44 Montgomery Street, Suite 400
San Francisco, California 94104

Alex Huddleston
State Bar No. 10148400
alex.huddleston@strasburger.com
STRASBURGER & PRICE, LLP
300 Convent St., Suite 900
San Antonio, Texas 78205

Merritt N. Spencer
State Bar No. 18925100
merritt.spencer@strasburger.com
STRASBURGER & PRICE, LLP
600 Congress Ave., Suite 1600
Austin, Texas 78701

Eduardo Roberto Rodriguez
State Bar No. 00000080
errodriguez@atlashall.com
E. Michael Rodriguez
State Bar No. 00791553
mrodriguez@atlashall.com
ATLAS HALL RODRIGUEZ
50 W. Morrison Rd., St. A
Brownsville, Texas 78520

*Attorneys for Appellants*

_/s/  Susan S. Vance_____
Susan S. Vance

## CERTIFICATE OF COMPLIANCE

Based on a word count run in Microsoft Word 2013, this brief contains 7,261 words, excluding the portions of the brief exempt from the word count under Texas Rule of Appellate Procedure 9.4(i)(1).

_/s/  Susan S. Vance_____
Susan S. Vance